# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-2419
No. 02-2522

_____

| | | |
|---|---|---|
| Richard D. Clay, | * | |
| | * | |
| Petitioner - Appellee/ | * | |
| Cross Appellant, | * | |
| | * | Appeals from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| Michael Bowersox, | * | |
| | * | |
| Respondent - Appellant/ | * | |
| Cross Appellee. | * | |

_____

Submitted: November 20, 2003

Filed: May 17, 2004

_____

Before LOKEN, Chief Judge, WOLLMAN and COLLOTON, Circuit Judges.

_____

LOKEN, Chief Judge.

A Missouri state court jury found Richard Clay guilty of the first degree murder of Randy Martindale. A few months later, a second jury convicted Martindale's estranged wife Stacy of hiring the murderer. The Missouri Supreme Court affirmed Clay's conviction and death sentence and the denial of state post-conviction relief. State v. Clay, 975 S.W.2d 121 (Mo. 1998) (en banc). Clay then filed this petition for

a federal writ of habeas corpus, bolstering many of his state court contentions with new evidence and legal theories. The district court granted the writ on the grounds that the guilt phase of Clay's trial was tainted by three Brady violations, one of which was aggravated by the prosecutor's improper closing argument, and by the ineffective assistance of trial counsel. The State appeals those rulings. Clay cross-appeals the denial of relief on five other grounds. Concluding that Clay failed to show Brady materiality or Strickland prejudice, we reverse the grant of habeas relief. We affirm the rulings challenged on cross appeal and remand with instructions to deny the writ.

## FACTUAL BACKGROUND

Stacy and Randy Martindale separated in late April 1994. On May 19, Randy took their two sons to an evening baseball game, returning the boys to Stacy's home around 10:00 p.m. Stacy invited Randy to spend the night. At approximately 11:35 p.m., Randy was shot four times as he sat in Stacy's bedroom. The first three shots were fired from across the room and disabled Randy. The fourth was fired into his head and neck from close range. Randy bled to death. Stacy ran from the room and woke her neighbors, screaming, "they shot him."

Shortly thereafter, New Madrid police officer Claude McFerren saw Stacy's red Camaro proceeding slowly away from the Martindale home, emitting sparks because a child's tractor was lodged beneath the car. McFerren pursued, suspecting an intoxicated driver, and activated his emergency lights when the Camaro accelerated. McFerren caught up with the car stopped on a gravel road with the engine running and both doors open. When Randy's homicide was reported, the police began a twelve-hour manhunt for the person whose footprints were traced from the passenger door into adjacent fields, past commercial premises, and ultimately into a swamp. During the search, Highway Patrol Officer Greg Kenley found a dry .380 caliber cartridge lying in dew-covered grass. At trial, a police expert testified that the bullet came from the same ammunition clip as the casings found at the crime scene.

The search continued through the night. The next day, an officer saw Clay run into the woods carrying a black shaving kit. As officers approached, Clay emptied the kit and eluded them. Some time later, an officer saw Clay's face surface for air from chest-high swamp water. The police arrested Clay and found his empty black kit. Clay's Reebok shoes matched the footprints leading from the Camaro. The murder weapon was never found.

At trial, Clay's friend, Charles Sanders, testified that he had a long-standing affair with Stacy Martindale. In February of 1994, Sanders testified, Stacy first asked him to kill her husband. Sanders denied intending to do so but admitted leading Stacy to think otherwise. Sanders borrowed a gun, purchased ammunition, and practiced firing it with Stacy. At one point, Stacy offered Sanders $10,000 to kill Randy and gave him a check for $4,996.36 as a down payment. Sanders kept the check a few weeks before he returned it to Stacy, saying he could not do the killing. (Sanders misplaced a carbon copy of the check, which was turned in to the police shortly after Randy's murder.) Sanders further testified that he told Clay about Stacy's request. Clay replied it was a "crazy" idea. According to Sanders, Clay frequently borrowed Sanders's car and twice removed the gun from the car and left it with a friend without Sanders's permission.

Sanders testified that, on the afternoon of the murder, he and Clay sat in Sanders's car outside the store where Sanders worked, waiting for Stacy. She arrived and insisted that Sanders kill her husband. He refused, they argued heatedly, and Stacy said she would ask Clay to do it. Stacy and Clay then drove off in her car to a nearby restaurant. A few minutes later, Sanders briefly talked with Clay in the restaurant parking lot but did not see him again that night. Sanders did not testify to any incriminating statements by Clay or otherwise corroborate the State's theory -- that Clay went to a friend's trailer home and left with the black shaving kit; that Stacy picked up Clay at a local hotel and drove him to her home; and that Clay hid in a bedroom closet until shooting Randy and then fled alone in Stacy's car.

After the State rested, Clay took the stand in his own defense. He admitted riding to the restaurant alone with Stacy but denied they discussed killing Randy. Later that evening, Clay testified, a friend drove him to a local hotel where he bought illegal drugs on consignment from two out-of-town suppliers. While he was phoning potential drug customers from the hotel, Sanders arrived. When Clay said he got the drugs, the two went to the hotel parking lot where Stacy was waiting. Stacy did not have cash to buy drugs with her, so the trio proceeded in Stacy's car to her home. While Clay and Sanders waited in the Camaro, Randy returned home with the boys and ordered Clay and Sanders to leave. After Randy entered the house, Stacy came to the door, gave Sanders the keys to the Camaro, and told him to return it after getting his own car. Clay and Sanders left in the Camaro, with Sanders driving. When a police car began pursuing, Clay told Sanders to stop and ran from the passenger side to avoid being caught with the drugs in his black shaving kit. The next morning, he threw the drugs into the swamp and abandoned the empty shaving kit. He did not learn of Randy's murder until after his arrest.

## I. THE STATE'S APPEAL

**A. Sanders Plea Agreement Issues.** The district court granted relief on Clay's claim that he was denied due process because the prosecution did not accurately disclose its plea agreement with Sanders and misled the jury about the terms of that agreement in closing argument.

**1. The Trial Testimony.** Some weeks after the murder, Sanders was charged with first degree murder, conspiracy to commit murder, and armed criminal action. He surrendered in early July and agreed to cooperate. On July 18, 1994, prosecutor Riley Bock and Sanders agreed in writing that the State would dismiss the pending charges, file a single class D felony charge of hindering prosecution, and recommend a five-year suspended sentence and five years of supervised probation provided that Sanders gave "complete, truthful and verifiable information" and pleaded guilty to

that charge at the conclusion "of all proceedings against all other defendants." That same day, Sanders gave a lengthy statement to the police. The next day, he disclosed that after the murder he hid the rest of the box of ammunition he had bought for the borrowed gun. The shells were recovered and were identified at trial as identical to the shell found during the search for Clay and to the casings found at the crime scene. Prosecutor Bock took the position that this nondisclosure justified revoking the plea agreement; Sanders's attorney disagreed.

Before Sanders testified at Stacy's preliminary hearing on September 26, 1994, his attorney placed a revised plea agreement on the record:

> That in exchange for Mr. Sanders' complete and truthful testimony here today [and] at any future proceedings as relates to Stacy Martindale and [Clay], the State will recommend a term of incarceration on an amended charge of homicide of a term of either 5 years in the Department of Corrections, or 10 years in the Department of Corrections. . . . In the event that the 85 percent rule [in a recently enacted crime bill, MO. STAT. § 558.019] applies to Mr. Sanders, the recommendation will be 5 years. In the event that that 85 percent rule does not apply, the recommended term will be 10 years.

Counsel also filed a motion to enforce the more lenient July 18 plea agreement, arguing that Sanders had complied with its obligations and detrimentally relied on the prosecutor's written promise to recommend a probation sentence. When Clay's attorney deposed Sanders two months before Clay's June 1995 trial, Sanders disclosed the initial plea agreement, accurately described the revised agreement, and testified that he understood the revised agreement was still in effect.

At Clay's trial, Sanders initially described the revised plea agreement on direct examination:

A.  My understanding of the current agreement is if I tell what I know truthfully that it would be recommended that I receive 10 years in the State penitentiary for an unspecified crime.
Q.  Not probation, but 10 years?
A.  10 years in prison, yes.
Q.  You understand that?
A.  Yes, sir.

Clay's attorney cross-examined Sanders on this issue, seeking to establish that he expected to be treated more leniently:

Q.  Isn't it your position that you have a deal to receive probation from the State?
A.  We have a motion to that effect. My attorney does have a motion, yes.
. . . .
Q.  When you made a statement to the police on July 18th of 1994, had you entered into an agreement with the State?
A.  Yes, sir.
Q.  And that agreement was for you to receive probation?
A.  Yes, sir, I believe it was five years probation.
Q.  And was part of that agreement that unless you violated the agreement . . . unless you testified falsely, that you would receive probation?
A.  Yes, sir . . . if I came forth fully and truthfully, I would receive probation.
Q.  And is it your position that agreement is still in effect?
A.  I believe it should be, yes.
. . . .
Q.  Your position is that you have an agreement for probation?
A.  Yes, that I should have, yes.
. . . .
Q.  [I]t is your position that you should receive probation and not 10 years?
A.  Yes, that is what I believe.

On redirect, Sanders was questioned further on the issue:

> Q. Let's talk about this . . . discrepancy about what's going to happen to you. [Defense counsel] asked what you've been charged with. You were charged before you talked to the police, is that a fair statement?
>
> A. Yes, that is correct.
>
> . . . .
>
> Q. And earlier in direct exam when we talked about the statement, you said there was . . . a controversy over whether you had been fully open to the police?
>
> A. Yes, sir.
>
> Q. Explain that to the jury.
>
> A. I was instructed to sit down and give my statement . . . . And then they came back and questioned me on different parts of my statement . . . . [M]y attorney told me that night I should go over everything in my head and try to remember if I left anything out so it wouldn't appear to be that I was hiding anything. And that was the one thing that I could think of that I possibly knew where that box of shells was. And so the next day when the investigators came back to talk to me, I told them that I might possibly know where that box of shells was.
>
> Q. And at that point, this plea agreement for probation was revoked, was it not?
>
> A. Yes, it was.
>
> Q. What is your understanding of the sentence that you are going to receive, that's going to be recommended by Mr. Bock when you come to court?
>
> A. My understanding is 10 years in the penitentiary.
>
> Q. And what do you hope for with your lawyer's help?
>
> A. . . . [W]e have a motion right now that's pending, I hope that my lawyers will be able to argue the motion and make the prosecution stick to the original agreement.
>
> Q. But if that's unsuccessful, . . . what is your expectation as to what sentence if any you will receive?

A.   My lawyers have told me to count on the 10 years and if I get anything better, to be happy with it.

**2. The Closing Arguments.** In the State's initial closing argument, prosecutor Bock made no mention of Sanders's plea agreement. Clay's attorney addressed the issue at length in his closing:

> And what about Chuck Sanders' word? I mean can you believe what he says? . . . If you believe the State they promise him probation and he still lies to them. I mean his testimony was my deal can't change from probation . . . unless I lie to them. . . . The State believes Chuck Sanders so much that they've revoked the deal. . . . He's charged with murder in the first degree, charged with armed criminal action and conspiracy to commit murder. And the State believes him so much that he is charged with those offenses to this date as we stand and sit here. I mean you have the right to ask, you know, what's the real deal? Is it probation? Is it time? I mean wouldn't you like to know?

In the State's rebuttal closing, Assistant Attorney General Hulshof argued, "And in regard to Chuck Sanders, ladies and gentlemen, Chuck Sanders is going to get 10 years in prison . . . . Let there be no mistake about it."

**3. Sanders's Conviction and Sentence.** Sanders testified at Clay's trial in June 1995 and at Stacy's trial later that year. In July 1996, Sanders's attorney wrote prosecutor Bock, urging him to reduce the still-pending charges and to recommend a sentence of probation because "the record is clear that the State is of the opinion, and in fact argued such before the [Stacy] Martindale jury, that Mr. Sanders abandoned his involvement in the conspiracy to murder Randy Martindale." The State then filed an amended information charging Sanders with tampering with physical evidence (the box of shells), a class D felony. At a change-of-plea hearing, Sanders withdrew his motion to enforce the original plea agreement and pleaded guilty to the new charge. Both attorneys agreed that, at sentencing, the State would

recommend a five-year prison sentence and Sanders would ask for probation. The court accepted the plea, requested a pre-sentence investigation, and scheduled a sentencing hearing. At the August 22 sentencing hearing, the State urged a five-year prison sentence. The court sentenced Sanders to five years probation.

**4. The State Court Rulings.** In his motion for state post-conviction relief, Clay argued that he should be granted a new trial because the State (1) failed to reveal that it would reduce the charge to a felony for which the maximum punishment is five years in prison, and (2) misled the jury by arguing in rebuttal that "Chuck Sanders is going to get 10 years in prison." The trial court found no prejudice because defense counsel was given a copy of the initial written plea agreement and "[t]he nature of the plea bargain appears to have been thoroughly discussed on the stand." The Supreme Court of Missouri affirmed, observing that Sanders's final plea agreement was not made until long after Clay's trial. "The State does not commit prosecutorial misconduct for failing to reveal information that did not exist at the time." 975 S.W.2d at 141. The record before the state courts supports this ruling.

**5. The District Court Grants Relief Based on New Evidence.** Clay renewed this claim in his petition for federal habeas relief. He then submitted as part of a motion for evidentiary hearing an April 14, 2001, affidavit in which Sanders avers that on the first day of Clay's trial:

> Riley Bock told me that the ten years would be what was on paper, but that he would not push it with my sentencing judge, meaning he would not try to push the judge to actually sentence me to ten years in prison. Mr. Bock indicated that it couldn't appear to the jury that nothing was going to happen to me or they would not believe my testimony. My attorneys said that because the prosecutor wasn't going to push the ten-year sentence, the court would never give me such a sentence. *I never believed that I would receive a sentence of ten years in prison.*

(Emphasis added.) Relying heavily on this affidavit, the district court concluded that the prosecution failed to disclose the real plea agreement at Clay's trial and misled the jury in closing argument, commenting that "no intervening event" after the trial explains the State's decision to charge Sanders with a class D felony. The non-disclosure and improper argument were material and prejudicial, the court concluded, because "the State's case against Clay crucially depended on Sanders's testimony" and Sanders's affidavit "essentially recant[ed] his trial testimony."

**6. Analysis.** Due process requires that the government disclose any promise that a key witness will not be prosecuted if he testifies for the government. Evidence of such an agreement "would be relevant to his credibility and the jury was entitled to know of it." Giglio v. United States, 405 U.S. 150, 155 (1972); see United States v. Foster, 874 F.2d 491, 495 (8th Cir. 1988). Here, the prosecution did disclose a plea agreement with Sanders. Indeed, the jury learned that the prosecutor had revoked an initial agreement, that Sanders had filed a motion to enforce that agreement, and that at least one aspect of the revised agreement (the crime to be charged) had not been determined. Defense counsel also knew that the agreement was conditioned on at least one future event, Sanders testifying truthfully at Stacy's trial. Thus, assuming that the prosecution failed to disclose additional details that could have been used to impeach Sanders's description of the agreement, the question is whether that evidence was material. The materiality standard under Brady v. Maryland, 373 U.S. 83, 87 (1963), is the same as the prejudice standard under Strickland v. Washington, 466 U.S. 668, 694 (1984) -- whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985).

We conclude that this habeas claim must be denied because the undisclosed information was not material. First, the impeachment value of the information was relatively insignificant. Clay's attorney strongly attacked Sanders's credibility in cross-examination and closing argument, noting among other things that he was

charged with murder and conspiracy to commit murder; that he had obtained a favorable initial plea agreement; and that the prosecutor revoked that agreement because he lied to the police. The jury knew that there was a revised plea agreement ensuring Sanders a relatively lenient sentence for conspiracy to murder and that there was an unresolved dispute over whether the prosecution had properly revoked an even more lenient initial plea agreement. These disclosures made the jury "sufficiently apprised of the potential taint on the witness's credibility to ensure a fair trial." Burton v. Dormire, 295 F.3d 839, 847 (8th Cir. 2002), cert. denied, 538 U.S. 1002 (2003). In his affidavit, signed and submitted to the district court nearly six years after the trial, Sanders asserts that, based on what prosecutor Bock told him before trial, "I never believed that I would receive a sentence of ten years in prison." By contrast, at trial Sanders testified on cross examination that the initial plea agreement "should be" in effect and therefore he "should receive probation and not 10 years," and he testified on redirect, "My lawyers have told me to count on the 10 years and if I get anything better, to be happy with it." The affidavit and the trial testimony are not inconsistent, and the difference in nuance is so slight that it would not likely have affected the jury's decision as to Sanders's credibility regarding the critical events that preceded the murder of Randy Martindale.

Second, this case is unlike Reutter v. Solem, 888 F.2d 578, 581 (8th Cir. 1989), where the prosecution failed to disclose that the parole board had postponed a commutation hearing until after the testimony of a witness on whom the State's case "depended almost entirely." Sanders's testimony was unquestionably important to the State's case -- he explained Stacy's ongoing effort to find someone to kill her husband, Clay's knowledge of that effort, and Clay's time alone with Stacy early on the night of the murder. Clay did not deny these background facts when he testified. Sanders did not directly incriminate Clay, instead testifying that he did not see Clay or Stacy again that evening, testimony that the State corroborated through other witnesses. The most damaging evidence against Clay came from other witnesses -- fleeing the Camaro and hiding from the police in a swamp, the bullet found on his

escape route, and the prosecutor's cross examination of Clay, which used a detailed reconstruction of events on the night in question to impeach his exculpatory version. After the State rested, it was Clay who tried to put his friend Sanders in the thick of things, testifying that Sanders and Stacy met Clay to buy drugs and that Sanders was driving the Camaro when they fled from Officer McFerren's pursuit. In the end, the jury deliberated for less than two hours in reaching its decision to discredit Clay's testimony and find him guilty of murder, making the materiality issue here comparable to that in Dye v. Stender, 208 F.3d 662, 666-67 (8th Cir. 2000).

Finally, we disagree with the district court's conclusion that Sanders's affidavit "essentially recant[ed] his trial testimony." The affidavit addressed no part of Sanders's testimony other than his belief as to his likely sentence. It provided no evidence that Clay was innocent of the crime or that the State's proof was otherwise suspect. In these circumstances, even if Clay may be excused for not presenting this affidavit to the state courts, the alleged nondisclosure was not material. Therefore, we must deny this habeas claim because the state court proceedings did not result in a decision that was contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court. See 28 U.S.C. § 2254(d)(1).[1]

---

[1]We have serious doubts about the merits of the district court's decision that the State failed to disclose the true plea agreement and misled the jury in closing argument. Prosecutor Bock submitted an affidavit explaining that, after taking the position during Stacy's trial that Sanders had withdrawn from the conspiracy, he was concerned that prosecuting Sanders for conspiracy to commit murder would violate his duty "to 'refrain from prosecuting a charge that the prosecutor knows is not supported by probable cause.'" Though this affidavit described an "intervening event," the court dismissed it as lacking credibility, based on the court's view that Sanders had not withdrawn from the conspiracy. By contrast, the court declared Sanders's affidavit credible, ignoring an affidavit from Sanders's own attorney stating: "I have read the affidavit of Charles Sanders (dated April 14, 2001) and find it to be false. . . . There was no undisclosed agreement." Such credibility issues should not be resolved on the basis of conflicting affidavits. See Kingsberry v. United States, 202 F.3d 1030, 1033 (8th Cir.), cert. denied, 531 U.S. 829 (2000).

-12-

**B. The Car Door Witnesses.** At the evidentiary hearing on Clay's motion for state post-conviction relief, he submitted deposition testimony by three witnesses who said they saw the Camaro stop on the gravel road on the night in question, saw both doors open almost at the same time, and gave that information to a police interviewer. Clay argued that trial counsel's failure to uncover these witnesses was ineffective assistance. The Supreme Court of Missouri rejected this claim because Clay did not show the witnesses could have been located through reasonable investigation and would have provided a viable defense. Clay, 975 S.W.2d at 143. In his federal petition, Clay renewed the ineffective assistance claim and added a new claim -- that the prosecution violated Brady by failing to disclose these witnesses. The district court granted relief on both claims, concluding that Clay's procedural default of the Brady claim was cured by his belated filing of a habeas petition with the Supreme Court of Missouri; that the undisclosed testimony of the three witnesses was material because it would have negated the State's theory that Clay fled the murder scene alone; and that "if trial counsel had been aware of these witnesses and nonetheless failed to call them, then counsel's performance was deficient and prejudiced Clay's defense."

Again, we have serious doubts about the merits of the district court's rulings. Regarding the Brady claim, the record consists of identical affidavits from the three witnesses saying they told a police officer they saw the Camaro doors open simultaneously. The interviewing police officer is inconsistently identified in the record, which does not reveal whether the officer prepared a police report of the interviews and, if so, whether the report disclosed this information. Thus, there is no showing that the prosecution even knew of this information, much less had a basis to

---

Finally, the court ignored the fact that the prosecution only commented on the plea agreement in response to defense counsel's closing. The court did not consider whether this rebuttal constituted "fair response." United States v. Lee, 743 F.2d 1240, 1253 (8th Cir. 1984).

recognize it as materially exculpatory. The witnesses were known to Clay at the time of his state post-conviction hearing, so his failure to build an adequate factual record is fatal to this claim. See 28 U.S.C. § 2254(e)(2)(A)(ii). Regarding the ineffective assistance claim, the record does not reveal how Clay's post-conviction counsel uncovered these witnesses nor the extent of the investigation made by Clay's trial attorney. Therefore, the Supreme Court of Missouri's ruling that Clay failed to show they could have been located through reasonable investigation is both factually correct and a sound application of federal law. See Burger v. Kemp, 483 U.S. 776, 794-95 (1987).

Putting these concerns aside, we reject these habeas claims because Clay failed to show either Brady materiality or Strickland prejudice. Sanders, a prosecution witness, denied being at Stacy's home or in the Camaro when it fled. Clay testified Sanders was driving the car when it was abandoned. The State's theory was that Clay was alone and opened both car doors as a ruse before fleeing from the passenger side. Thus, testimony by three witnesses who saw both car doors open "at about the same time" (the post-conviction argument to the state courts) or "simultaneously" (the word used in three identical affidavits submitted to the district court) would have been somewhat helpful to the defense. But it would also have been cumulative. At trial, Clay's counsel called defense witness Lee Boyd, who testified that, when he observed the Camaro driving with sparks flying that night, "I seen the images of two people" in the car. Boyd's testimony did not conclusively establish the point, but the information offered by the three witnesses would have been even less probative because they saw only the doors open, not any people emerge from the Camaro. When the government fails to disclose only cumulative evidence, "it has committed no Brady violation." United States v. Zuazo, 243 F.3d 428, 431 (8th Cir. 2001).

Moreover, Clay was on trial, not Sanders, and the jury could have found Clay guilty regardless of whether one or two people were in the Camaro when Officer McFerren pursued it. The evidence proffered by the three witnesses does not

exonerate Clay. He admitted he was in the Camaro and fled out the passenger door. At best, this evidence would have lent additional support to one part of Clay's exculpatory explanation of his actions that night. "However, materiality is not established by the mere possibility that the withheld evidence may have influenced the jury." United States v. Jones, 160 F.3d 473, 479 (8th Cir. 1998). The evidence proffered in the three identical affidavits is too inconclusive, and its relevance too marginal, to create a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.

**C.  The Unsigned Police Officer Affidavit.**  At trial, Officer McFerren testified that he did not know how many people were in the Camaro when he pursued it, but he found both car doors open and the engine running when he arrived at the abandoned vehicle.  On cross examination, McFerren stated that he stood in the driver's side doorway when he turned off the car's ignition.  Trooper Kenley, who arrived on the scene shortly thereafter, testified that he suspected two people had been in the car because both doors were open.  Therefore, he carefully examined the ground near the driver's side door but saw "no indication of any foot tracks at all" in the rather loosely packed sand and gravel.  Kenley added, "I asked Officer McFerren if he had seen any [tracks], and he said no."  Consistent with this testimony, Kenley's contemporaneous police report stated, "the only set of footprints leading away from the car started from the passenger side and went east."  No issue of driver's side footprints was raised on direct appeal or in Clay's motion for state post-conviction relief.

Years later, according to an affidavit by Clay's investigator submitted to the district court, one of Clay's federal habeas attorneys drafted and presented to Officer McFerren an affidavit stating:

> [W]hile I was at the scene of the red Camaro . . . . Trooper Kenley asked
> me about a set of footprints coming from the driver's side of the

Camaro. I told him that they must have been my prints as I had approached the driver's side of the car and turned off the ignition. Any footprints that I left on the driver's side of the car would have covered prints made by the driver of the car as he exited the car.

According to the investigator's affidavit, McFerren said, "I don't see why I can't sign this." But after showing the draft affidavit to prosecutor Bock, McFerren said Bock "told him not to sign the affidavit."

Based solely on the investigator's affidavit, the district court ruled that the State's failure to disclose footprints on the driver's side of the Camaro was a <u>Brady</u> violation warranting federal habeas relief. We strongly disagree. First, the issue was procedurally barred. Second, the investigator's affidavit was not probative evidence. Third, Clay made no showing that his attorney had a legitimate basis for the facts set forth in the draft affidavit, which were contrary to trial testimony and a police report not previously challenged. Fourth, there was no showing refuting an obviously innocent explanation for what the investigator allegedly observed -- assuming McFerren read the affidavit and initially said, "I don't see why I can't sign this," he declined to sign it when prosecutor Bock pointed out its factual inaccuracy. Fifth, as we have explained, evidence that McFerren left footprints on the driver's side when he turned off the Camaro's engine does not satisfy <u>Brady</u>'s materiality standard.

## II. CLAY'S CROSS-APPEAL

Clay cross-appeals the district court's decision to deny federal habeas relief on five other grounds. Like the district court, we reject these contentions.

**A. Allegedly Contradictory Prosecution Theories.** Clay argues that his due process rights were violated when the prosecutor presented contradictory theories at his trial and Stacy Martindale's trial. "To violate due process, an inconsistency must

exist at the core of the prosecutor's cases against defendants for the same crime," and the State's error must have "rendered unreliable" the habeas petitioner's conviction. Smith v. Groose, 205 F.3d 1045, 1052 (8th Cir.), cert. denied, 531 U.S. 985 (2000). Here, Clay's only showing that the State argued an inconsistent theory to Stacy's jury is a purported quote from the prosecutor's closing argument, not part of the record on appeal, that Clay might have "gotten cold feet" in the Martindale house on the night of the murder and left Stacy to do the shooting. There is no showing that inconsistent evidence was presented to the two juries, as in Smith v. Groose and in Thompson v. Calderon, 120 F.3d 1045, 1059 (9th Cir. 1997) (en banc), vacated on other grounds, 523 U.S. 538 (1998). If the prosecutor did acknowledge to Stacy's jury that the evidence presented to both juries left open the possibility that either murderer could have pulled the trigger, this does not render Clay's conviction unreliable.

**B. Jury Selection Discovery.** Clay next argues that the district court erred in denying his request for discovery that *might* uncover evidence that Clay's jury did not represent a fair cross-section of the community. The state courts denied Clay's motion for post-conviction discovery because he "does not allege that any particular cognizable group was underrepresented." 975 S.W.2d at 141. The district court properly rejected this claim because "Clay cites no authority -- nor can the Court find any -- which indicates that the [state] motion court committed *constitutional* error by denying the request." See generally Duren v. Missouri, 439 U.S. 357 (1979).

**C. An Aggravating Circumstances Instruction.** Clay next argues that the trial court's "depravity of mind" aggravating circumstance instruction was overbroad and not supported by sufficient evidence. The Supreme Court of Missouri rejected these claims, in part because "[t]he jury need find only one statutory aggravating circumstance in order to recommend imposition of the death penalty." 975 S.W.2d at 145. This ruling was consistent with clearly established federal law.

The jury found the presence of two aggravating circumstances, that the murder was at the direction of Stacy Martindale and reflected depravity of mind. Under Missouri law, "where at least two aggravating circumstances are found, the failure of one does not mandate reversal or resentencing." Mercer v. Armontrout, 844 F.2d 582, 584 (8th Cir.), cert. denied, 488 U.S. 900 (1988); see State v. Malone, 694 S.W.2d 723, 728 (Mo. 1985) (en banc), cert. denied, 476 U.S. 1165 (1986). In a non-weighing state such as Missouri, a finding of one valid aggravating circumstance renders harmless the conclusion that a second aggravating circumstance was constitutionally infirm. See Tokar v. Bowersox, 198 F.3d 1039, 1051 (8th Cir. 1999), cert. denied, 531 U.S. 886 (2000); Sloan v. Delo, 54 F.3d 1371, 1385-86 (8th Cir. 1995), cert. denied, 516 U.S. 1056 (1996). At oral argument, Clay argued for the first time that this principle should not apply because the trial court's instructions directed the jury to weigh the aggravating circumstances against the mitigating circumstances. This argument was not presented to the state courts or to the district court and thus was not preserved for federal habeas review. See Flieger v. Delo, 16 F.3d 878, 884 (8th Cir.), cert. denied, 513 U.S. 946 (1994).

**D. Proportionality Review.** Missouri law requires that the state supreme court review any death sentence to ensure that the State does not impose the death penalty disproportionately. See MO. ANN. STAT. § 565.035. Clay argues that the proportionality review in this case denied him due process because the Supreme Court of Missouri cited only cases in which the death penalty was imposed. 975 S.W.2d at 146. This claim is without merit. Once the federal court determines, as we have here, that the Supreme Court of Missouri reviewed the sentence for proportionality, our inquiry is complete. See Zeitvogel v. Delo, 84 F.3d 276, 284 (8th Cir.), cert. denied, 519 U.S. 953 (1996). "The Constitution does not require us to look behind [a state supreme court's proportionality] conclusion." Walton v. Arizona, 497 U.S. 639, 656 (1990), overruled on other grounds by Ring v. Arizona, 536 U.S. 584 (2002).

-18-

**E. Ineffective Assistance of Post-Conviction Counsel.** In the state courts, Clay's direct appeal was stayed while his appellate attorney litigated the motion for post-conviction relief in the trial court. During the evidentiary hearing on that motion, counsel learned of a two-page report summarizing a supplemental interview of Sanders by two homicide investigators that was not produced to defense counsel prior to Clay's trial. Counsel argued that Clay's post-conviction motion should be granted because the prosecution's failure to produce the report before trial was a <u>Brady</u> violation that could not have been discovered at or before trial. The motion court denied this claim. Clay did not raise the issue in his consolidated appeal to the Supreme Court of Missouri, but he renewed it in his federal habeas petition, arguing that ineffective assistance of appellate counsel excuses his procedural default.

There is no federal constitutional right to the effective assistance of post-conviction counsel. <u>See</u> <u>Coleman v. Thompson</u>, 501 U.S. 722, 752 (1991). In Missouri, the direct appeal from a conviction and sentence and the appeal from the denial of a motion for post-conviction relief are often consolidated. It is well-settled that the appellant in a consolidated appeal is only "entitled to effective assistance of counsel on that portion of the hybrid appeal that was devoted to direct-appeal issues because he has no right to effective assistance of counsel on that portion of the hybrid appeal devoted to the appeal of his Rule 29.15 claims." <u>Lowe-Bey v. Groose</u>, 28 F.3d 816, 820 (8th Cir.), <u>cert. denied</u>, 513 U.S. 1061 (1994); <u>see</u> <u>Oxford v. Delo</u>, 59 F.3d 741, 748 (8th Cir. 1995), <u>cert. denied</u>, 517 U.S. 1124 (1996). Clay argues that the failure to appeal this <u>Brady</u> claim should be deemed an error of direct appeal counsel, citing a case in which the Supreme Court of Missouri ordered a hearing on a <u>Brady</u> claim first uncovered while only a direct appeal was pending. But that is not what happened in this case. This claim was presented to the motion court as a claim for post-conviction relief. Therefore, we agree with the district court that the failure to raise the issue in the consolidated appeal was "the failure of post-conviction appellate counsel." <u>Cf.</u> <u>Shigemura v. Groose</u>, 45 F.3d 250, 252-53 (8th Cir.), <u>cert. denied</u>, 516 U.S. 855 (1995).

For the foregoing reasons, the orders of the district court are affirmed in part and reversed in part, and the case is remanded with directions to deny the petition for a writ of habeas corpus in its entirety. Appellant's motion to expand the record on appeal is granted.

_____