# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-8016

_____

| | | |
|---|---|---|
| In re Elizabeth Unger Carlyle, | * | Appeal from the United States |
| | * | District Court for the |
| Petitioner. | * | Western District of Missouri. |

_____

Submitted: May 31, 2011
Filed: July 11, 2011

_____

Before RILEY, Chief Judge, in chambers.

_____

RILEY, Chief Judge.

Elizabeth Unger Carlyle, an attorney appointed under the Criminal Justice Act (CJA), 18 U.S.C. § 3006A, appeals from various orders of the district court[1] to me in my capacity as Chief Judge of the United States Court of Appeals for the Eighth Circuit. Carlyle asked the district court to reimburse her $37,876.80 for various extra-judicial activities undertaken "to delay and prevent" the execution of Richard D. Clay, a Missouri convicted murderer. The district court granted in part and denied in part

_____

[1]The Honorable Dean Whipple, United States District Judge for the Western District of Missouri.

Carlyle's requests, authorizing $7,000 for Carlyle to pursue state clemency proceedings on Clay's behalf. I dismiss Carlyle's appeal for lack of jurisdiction.[2]

## I.    BACKGROUND

At all relevant times, Clay was an indigent inmate on Missouri's death row. A Missouri jury found Stacy Martindale hired Clay in 1994 to murder her husband, Randy Martindale. See generally, Clay v. Bowersox, 367 F.3d 993, 1006 (8th Cir. 2004) (reversing district court's grant of habeas relief); State v. Clay, 975 S.W.2d 121, 129 (Mo. 1998) (affirming Clay's conviction and death sentence, as well as the denial of state post-conviction relief).

In January 1999, the district court appointed Carlyle and Jennifer Herndon, also an attorney (collectively, counsel), to prepare and present Clay's 28 U.S.C. § 2254 habeas corpus application. Although Clay's application was ultimately unsuccessful, counsel were paid under the CJA for their efforts on Clay's behalf.

In May 2005, counsel moved the district court *ex parte* under 18 U.S.C. §§ 3006A and 3559[3] to pre-approve payment for all "fees and expenses . . . relating to the research, writing, investigation and presentation of a petition for executive clemency" to Missouri's governor. Counsel opined, "The failure to authorize payment

_____

[2]Because this appeal appears to raise first-impression issues and may be important to the administration of the CJA in this circuit, I publish my order as a written opinion. See, e.g., In re Gross, 704 F.2d 670, 671 (2d Cir. 1983) (Feinberg, C.J.). Although some pleadings were filed *ex parte* and under seal below, the underlying case has concluded and most of the background to this appeal may be found in publicly available orders. See also 18 U.S.C. § 3006A(d)(4) (providing generally for public disclosure).

[3]Despite the resulting anachronisms, for clarity and convenience I only cite the current, renumbered version of the United States Code. See Pub. L. No. 109-177, 120 Stat. 192, 231-232, §§ 221-222 (Mar. 9, 2006) (essentially transferring portions of 21 U.S.C. § 848 to 18 U.S.C. § 3599 without substantive change).

of fees and expenses . . . would inflict substantial financial hardship on counsel and their firms." Counsel did not request a specific amount.

Relying on 18 U.S.C. § 3599 and Hill v. Lockhart, 992 F.2d 801, 803 (8th Cir. 1993), the district court granted the *ex parte* motion in July 2005. The district court cautioned counsel that it was "not issuing a blank check" and qualified its order in four respects. The district court (1) set the rate of compensation at $125 per hour for each attorney; (2) capped counsel's combined fees at $3,500; (3) required prior approval for "investigative, expert, or other services"; and (4) ordered that, because the record in Clay's case was exhaustive and complete, "the Court will only reimburse counsel for their time and expenses . . . spent formulating arguments *from the existing record*."

Over five years later, in November 2010, counsel filed an *ex parte* motion to reconsider. Counsel argued (1) their hourly rates should be increased to $178 per hour; (2) they should be reimbursed for "clemency arguments outside the existing record"; and (3) the $3,500 cap was "highly restrictive" and should be lifted. Counsel provided the district court with a proposed budget, in which they sought $58,379 for client contact, investigative work, advocacy before the governor, community advocacy, and court advocacy.

In December 2010, the district court granted counsel's requests for an increase in their hourly rates and "for reimbursement to develop and formulate arguments outside the existing record." The district court granted in part and denied in part counsel's request to lift the $3,500 cap, increasing the total authorized expenditures to $7,000. The district court reasoned that, although § 3599 authorized reimbursing federally appointed counsel in state clemency proceedings, the district court retained the discretion to decide what amount of fees were reasonable.

The district court found counsel failed to justify their proposed $58,379 budget. The district court observed:

> Petitioner's counsel fails to identify particular individuals or issues that require exploration for the clemency proceedings, much less individuals or issues that were not covered in prior proceedings. Factually, and by way of example, the proposed budget vaguely seeks reimbursement for communications with "family, friends, etc. of client," but does not identify who those individuals are or what new information they may offer. The Motion also fails to adequately explain what legal issues may need supplementation. Finally, the proposed budget contains tasks that appear duplicative . . . .

> Put simply, the Motion wholly lacks the necessary detail and specificity to justify the significant fees and expenses requested. Given these deficiencies, the Court cannot conclude that the amount requested is reasonable.

> . . . .

> Additionally, this lack of detail suggests that the vast majority of Petitioner's clemency arguments have already been uncovered and raised in previous proceedings . . . . [T]his Court cannot condone the continual, repeated outflow of taxpayer funds to relitigate matters which Petitioner has already been given a full and fair opportunity to litigate. The merry-go-round of litigation in capital cases like this one must eventually stop.

(citations, footnote and internal marks omitted).

Approximately a week later, counsel filed a second motion to reconsider. After endeavoring to "provide specific details as to the exact work [counsel] have done in the case, and work that will be 'reasonably necessary,'" counsel asked the district court to lift its $7,000 cap and promise to fund their efforts at state clemency in full. In the alternative, counsel asked the district court for leave to withdraw their

-4-

representation of Clay, on the ground that "[c]ounsel are simply unable to provide the diligent and competent representation to which Mr. Clay is entitled before the state executes him without adequate resources." Counsel opined,

> there is no ethical requirement that they provide services *pro bono* and pay expenses out of their own pockets, but in any event they are unable to do so. They are both sole practitioners, and a significant amount of their income is derived from court-appointed cases. They do not have deep pockets that will support this case. Nor does Mr. Clay's family have resources adequate to this project; if they had they would have contributed them long since.
>
> . . . .
>
> Essentially, then, counsel are not being asked to provide their services and expenses *pro bono* to Mr. Clay. Instead, they are being asked to make an involuntary contribution to the United States Treasury. This is not, and should not be, required.

The district court summarily denied counsel's second motion to reconsider, including the alternative motion to withdraw. Due to a technological error, counsel did not receive a copy of the district court's order in a timely manner.

On January 7, 2011, counsel moved the district court to stay Clay's execution "to secure proper funding to pursue clemency and related relief." Counsel indicated they had received "a generous donation of $10,000" but, "as [the district court] is well aware, the donation does not even come close to covering the budget required to mount an adequate clemency campaign for Mr. Clay." Counsel represented, "It is clear that the evidence is out there, yet most of it is beyond counsel's reach at this time" and "it is crucial that they be afforded this opportunity before the state kills an innocent man."

The recent donation has allowed some investigation to begin, but the money has been more than exhausted. Although far from complete, the investigation is again stalled. Investigators do not have the resources to take money out of their pockets that they will never see again. They are not able to get in their cars; drive to locate and interview witnesses; and to pay for meals, gas and hotel expenses while on the road. At least 3 witnesses have been identified who live out of state, and who could have crucial information. There is no funding to purchase airline tickets to interview these witnesses.

. . . .

Counsel are solo practitioners, who do exclusively or near-exclusively court appointed work. They are not exempt from the average person's need for a paycheck to keep a roof over their families' heads, a car in the garage, and food on the table. Yet counsel are being asked to go without a paycheck for what will amount to more than two months worth of work. At least one month of that time has been devoted almost exclusively to Mr. Clay's case, leaving counsel with absolutely no income.

. . . .

Counsel believe in Mr. Clay's innocence and in his right to effective clemency, and have no desire to withdraw from his case. These beliefs are impossible to balance with the above-expressed personal concerns for counsel's livelihood. While the Court has not ruled on the motion to withdraw, it is questionable at this time as to whether counsel are functioning as counsel as contemplated by [Harbison v. Bell, 556 U.S. ___,129 S. Ct. 1481 (2009),] due to the absence of funding.

The district court promptly denied the motion to stay and provided counsel with a copy of its order denying counsel's second motion to reconsider. The district court ordered counsel to "continue to represent Petitioner to the best of their ability." The district court encouraged counsel to "record their time and expenses incurred" and "then submit their statement of fees and costs to the Court for review and approval."

Clay immediately appealed the denial of the motion to stay. On January 10, 2011, Clay also filed a largely redundant motion for stay of execution in the Eighth Circuit Court of Appeals pending "provision of adequate funding for his counsel to present clemency-related information to the Governor of Missouri." Missouri resisted Clay's request for a stay on the same date, even though it lacked access to counsel's proposed budget, which remained under *ex parte* seal. Missouri argued, *inter alia*, that counsel were derelict in waiting five years to file a motion to reconsider. The Eighth Circuit promptly denied the motion.

On January 11, 2011, the Governor of Missouri granted Clay clemency and commuted his death sentence to life in prison. The Eighth Circuit directed the parties to show cause why Clay's appeal should not be dismissed as moot. Neither party responded to the Eighth Circuit's show cause order, and the Eighth Circuit dismissed Clay's appeal. Carlyle later applied for and received CJA funds from the Eighth Circuit for her work on the appeal.

On January 20, 2011, Carlyle submitted a final CJA voucher to the district court seeking full reimbursement for "[t]he post-habeas phase of a capital case." Carlyle asked for $37,876.80, after deducting $12,096.40 in fees and expenses paid for by two donors.

On April 14, 2011, the district court adhered to its prior orders and declined to lift its $7,000 cap. Noting apparently no CJA funds had yet been disbursed, the district court authorized payment of the full $7,000 to Carlyle. Despite counsel's repeated protestations of poverty and imminent financial ruin, at no time did counsel ask the district court for emergency interim funding under the CJA.

Approximately six weeks later, on May 31, 2011, I received a four-page single spaced letter from Carlyle. Carlyle asks me to "reconsider the decision of [the district

court] to limit the payment of this voucher, including fees and expenses, to $7,000.00." Carlyle protests that the district court's $7,000 cap is "unfair," "inequitable," and "put [counsel] in the position of either violating [their] duty to Mr. Clay or risking performing uncompensated work." Attaching a series of exhibits, Carlyle explains some of the work she performed and asks me to review the record in the appeal. Carlyle "concede[s] that it would have been prudent to seek review of this order long before" but says attention to other matters and Missouri's delay in setting Clay's execution date explains her tardiness. Carlyle asks that I award her "reasonable compensation."

## II. DISCUSSION

Section 3599 authorizes federally appointed counsel to represent indigent death row inmates in state clemency proceedings. See Harbison, 556 U.S. at ___, 129 S. Ct. at 1485; cf. Hill, 992 F.2d at 803. However—and this is the paramount consideration here—Carlyle does not cite, and I cannot find, any legal authority granting a chief circuit judge jurisdiction to review a district court's reduction of a CJA voucher.[4]

The CJA generally permits counsel to submit *ex parte* applications to the district court for attorneys' fees, necessary expert services, and other services. See 18 U.S.C. §§ 3006A(d), (e). If counsel seeks funding in excess of certain predetermined limits, counsel must make a formal request and convince the district judge those limits are unreasonable and a waiver is necessary. See id. If the district court agrees, the district court certifies the request to the chief judge of the circuit for approval. See id.

---

[4]The only authorities Carlyle mentions in her letter are the American Bar Association's Guidelines for Appointment and Performance of Counsel in Death Penalty Cases and the Missouri Rules of Professional Conduct. Carlyle says the ABA Guidelines "informed [her] ethical responsibilities" and her "work . . . was undertaken with [the] responsibility [set forth in the Missouri Rules of Professional Conduct] in mind."

The CJA is otherwise silent regarding the chief judge's role in the review of CJA vouchers. It would appear, then, that my review of a CJA voucher is limited to the approval or disapproval of certified requests for payments in *excess* of the statutory limits. Because the CJA provides no mechanism whatsoever for the review of *reduced or denied* CJA vouchers below the statutory limits, the fixing of any CJA award within the predetermined limits is exclusively within the discretion of the appointing authority.

Occasionally, court-appointed attorneys have attempted to appeal a district court's denial or reduction of a CJA voucher. As far as I am aware, every circuit court of appeals and chief judge to consider the issue has held the CJA does not confer any appellate jurisdiction to review such an appeal and thus the district court's denial or reduction is unreviewable. See, e.g., United States v. Johnson, 391 F.3d 946, 948 (8th Cir. 2004); Rhinehart v. Eighth Circuit Court of Appeals, 218 F. App'x 547, 548 (8th Cir. 2007) (unpub. per curiam). See also United States v. French, 556 F.3d 1091, 1093 (10th Cir. 2009) (observing "[e]very circuit court of appeals to consider this jurisdictional question has held that CJA fee compensation determinations made by the district court are not appealable" and holding "CJA fee determinations are not appealable orders") (citing United States v. Stone, 53 F.3d 141, 143 (6th Cir. 1995); Shearin v. United States, 992 F.2d 1195, 1196 (Fed. Cir. 1993); Landano v. Rafferty, 859 F.2d 301, 302 (3d Cir. 1988); United States v. Rodriguez, 833 F.2d 1536, 1537-38 (11th Cir. 1987); In re Baker, 693 F.2d 925, 927 (9th Cir. 1982); and United States v. Smith, 633 F.2d 739, 742 (7th Cir. 1980)); Gross, 704 F.2d at 671-73.[5] I likewise

_____

[5]In United States v. Turner, 584 F.2d 1389 (8th Cir. 1978) (per curiam), a panel of the Eighth Circuit Court of Appeals held a district court did not abuse its discretion in limiting a CJA award to $250.00. But Turner did not examine the latent issue of subject matter jurisdiction and does not address the jurisdictional issue presented here, namely, whether a *chief judge* possesses any jurisdiction over the denial or reduction of a CJA voucher. A panel may indirectly determine whether a denial or reduction of a CJA voucher is wrong when the denial or reduction warrants reversal because the denial or reduction prejudiced the defendant's defense. Cf. United States

conclude the CJA does not confer appellate jurisdiction over Carlyle's appeal. As others have recognized, the non-adversarial nature of the CJA voucher process, which is wholly *ex parte*, evidences an administrative act not a judicial decision. See French, 556 F.3d at 1093 (citing Rodriguez, 833 F.2d at 1537-38 and Baker, 693 F.2d at 926-27). As the Supreme Court recently recognized in another context, "the determination of fees 'should not result in a second major litigation.' . . . We can hardly think of a sphere of judicial decisionmaking in which appellate micromanagement has less to recommend it." Fox v. Vice, 563 U.S. ___, ___, 131 S. Ct. 2205, 2216 (2011) (quoting Hensley v. Eckerhart, 461 U.S. 424, 437 (1983)).

Carlyle's contributions in Clay's service are important and appreciated. But it must be remembered that CJA service is first a professional responsibility, and no lawyer is entitled to full compensation for services for the public good.

> [I]t is . . . clear that Congress did not intend to provide full compensation and that it contemplated appointments of private counsel to supplement the efforts of professional defender organizations. Thus, although the increased maximum rates envisioned greater participation by the private bar, the [CJA] also presupposes recognition by private attorneys of their professional obligation to render services for those unable to pay. The [CJA] is in no way an attorney's full-employment act. Congress merely intended that those attorneys who devote themselves to the time-honored tradition of service should not go entirely without compensation.
>
> The history of the American bar is replete with instances of pro bono service by its members. That service has not been undertaken with regard to monetary enrichment, but has been motivated by the higher objective of obtaining equal justice for all, a goal which enriches and

---

v. Bledsoe, 674 F.2d 647, 668 (8th Cir. 1982). A circuit court of appeals in limited circumstances may exercise its supervisory powers if the district court completely neglects its duty to process a CJA voucher, so long as the amount of the voucher is not in question. See French, 556 F.3d at 1093-94 (discussing United States v. Davis, 953 F.2d 1482, 1497 (10th Cir. 1992)).

strengthens the commonweal. If our holding today discourages those who look upon the [CJA] as a profit center, so be it. We have not yet reached the day when other members of the bar will not step forward to take their place, dedicated to the principles of equal justice and competent representation for the less fortunate in our society.

Smith, 633 F.2d at 741 (citations omitted).  I agree.

There is no injustice in Carlyle failing to receive appellate review of the district judge's administrative refusal to remunerate her fully for her work on Clay's behalf in state clemency proceedings.  See United States v. Smith, 76 F. Supp. 2d 767, 773 (S.D. Tex. 1999) ("[T]he court takes seriously its inherent obligation to safeguard the limited funds, supplied by American taxpayers, which are available for attorney remibursement under the CJA.  The Court also expects counsel, when accepting their appointments, to recognize their time honored public service obligations as Officers of the Court.").  Carlyle's efforts on Clay's behalf are commendable, and I thank her for her service.

## III.    CONCLUSION

This matter is dismissed for lack of subject matter jurisdiction.

_____