[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 12, 2012
JOHN LEY
CLERK

_____

Nos. 09-16198, 11-10705, 11-15396

_____

D. C. Docket No. 04:97-cv-00181-CDL

CARLTON GARY,

Petitioner-Appellant,

versus

WARDEN, GEORGIA DIAGNOSTIC PRISON,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(July 12, 2012)


Before TJOFLAT, EDMONDSON and WILSON, Circuit Judges.

TJOFLAT, Circuit Judge:

A state prisoner under a sentence of death, who petitions a United States

District Court pursuant to 28 U.S.C. § 2254, for a writ of habeas corpus, is entitled

to the appointment of one or more attorneys if he is "financially unable to obtain

adequate representation." 18 U.S.C. § 3599(a)(2).[1] "[E]ach attorney so appointed

shall represent the [prisoner] throughout every subsequent stage of available

judicial proceedings," which includes "all available post-conviction process,

together with applications for stays of execution and other appropriate motions

and procedures," as well as "proceedings for executive or other clemency as may

---

[1] 18 U.S.C. § 3599 addresses both persons under indictment and awaiting trial in federal court and state prisoners under a sentence of death who petition a United States District Court pursuant to 28 U.S.C. § 2254 for writ of habeas corpus. 18 U.S.C. § 3599(a) reads:

(1) Notwithstanding any other provision of law to the contrary, in every criminal action in which a defendant is charged with a crime which may be punishable by death, a defendant who is or becomes financially unable to obtain adequate representation or investigative, expert, or other reasonably necessary services at any time either—

    (A) before judgment; or
    (B) after the entry of a judgment imposing a sentence of death but before the execution of that judgment;

shall be entitled to the appointment of one or more attorneys and the furnishing of such other services in accordance with subsections (b) through (f).

(2) In any post conviction proceeding under section 2254 or 2255 of title 28, United States Code, seeking to vacate or set aside a death sentence, any defendant who is or becomes financially unable to obtain adequate representation or investigative, expert, or other reasonably necessary services shall be entitled to the appointment of one or more attorneys and the furnishing of such other services in accordance with subsections (b) through (f).

be available." Id. § 3599(e).[2]  In addition, if the District Court "find[s] that investigative, expert, or other services are reasonably necessary for the representation of the [prisoner], whether in connection with issues relating to guilt or the sentence, the court may authorize the [prisoner's] attorneys to obtain such services on behalf of the [prisoner] and, if so authorized, shall order the payment of fees and expenses." Id. § 3599(f)–(g).[3]

---

[2]  18 U.S.C. § 3599(e) states:

[E]ach attorney so appointed shall represent the defendant throughout every subsequent stage of available judicial proceedings, including pretrial proceedings, trial, sentencing, motions for new trial, appeals, applications for writ of certiorari to the Supreme Court of the United States, and all available post-conviction process, together with applications for stays of execution and other appropriate motions and procedures, and shall also represent the defendant in such competency proceedings and proceedings for executive or other clemency as may be available to the defendant.

[3]  18 U.S.C. §§ 3599(f) and (g) state:

(f) Upon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, whether in connection with issues relating to guilt or the sentence, the court may authorize the defendant's attorneys to obtain such services on behalf of the defendant and, if so authorized, shall order the payment of fees and expenses therefor under subsection (g). No ex parte proceeding, communication, or request may be considered pursuant to this section unless a proper showing is made concerning the need for confidentiality. Any such proceeding, communication, or request shall be transcribed and made a part of the record available for appellate review.

(g)(1) Compensation shall be paid to attorneys appointed under this subsection at a rate of not more than $125 per hour for in-court and out-of-court time. The Judicial Conference is authorized to raise the maximum for hourly payment specified in the paragraph up to the aggregate of the overall average percentages of the adjustments in the rates of pay for the General Schedule made pursuant to section 5305 of title 5 on or after such date. After the rates are raised under the

In this case, Carlton Gary is a Georgia prisoner on death row. Gary received

the appointment of two attorneys under § 3599(a)(2) to prosecute his petition for a

writ of habeas corpus in the United States District Court for the Middle District of

Georgia.[4] After the writ was denied, and before Gary's execution was to take

place, the same attorneys represented Gary at a clemency hearing before the

Georgia Board of Pardons and Paroles (the "Board"). Clemency was denied, but

the Georgia Supreme Court stayed Gary's execution to enable him to pursue a

motion for deoxyribonucleic acid ("DNA") testing in the court in which he was

convicted and sentenced, the Superior Court for Muscogee County (the "DNA

motion"),[5] and, depending on the outcome of the DNA motion, an extraordinary

preceding sentence, such hourly range may be raised at intervals of not less than one year, up to the aggregate of the overall average percentages of such adjustments made since the last raise under this paragraph.

(2) Fees and expenses paid for investigative, expert, and other reasonably necessary services authorized under subsection (f) shall not exceed $7,500 in any case, unless payment in excess of that limit is certified by the court, or by the United States magistrate judge, if the services were rendered in connection with the case disposed of entirely before such magistrate judge, as necessary to provide fair compensation for services of an unusual character or duration, and the amount of the excess payment is approved by the chief judge of the circuit. The chief judge of the circuit may delegate such approval authority to an active or senior circuit judge.

[4] Gary's attorneys in his federal habeas case were John R. Martin and Michael K. McIntyre. They were originally appointed pursuant to 21 U.S.C. § 848(q)(4)(B). The relevant language of the two statutes is the same. We refer to their appointments as if they were made under § 3599 for the sake of clarity.

[5] The DNA motion was filed pursuant to O.C.G.A. § 5-5-41(c). O.C.G.A. § 5-5-41(c) provides, in relevant part:

(1) Subject to the provisions of subsections (a) and (b) of this Code section, a person convicted of a felony may file a written motion before the trial court that entered the judgment of conviction in his or her case, for the performance of forensic deoxyribonucleic acid (DNA) testing.

(2) The filing of the motion as provided in paragraph (1) of this subsection shall not automatically stay an execution.

(3) The motion shall be verified by the petitioner and shall show or provide the following:

> (A) Evidence that potentially contains deoxyribonucleic acid (DNA) was obtained in relation to the crime and subsequent indictment, which resulted in his or her conviction;

> (B) The evidence was not subjected to the requested DNA testing because the existence of the evidence was unknown to the petitioner or to the petitioner's trial attorney prior to trial or because the technology for the testing was not available at the time of trial;

> (C) The identity of the perpetrator was, or should have been, a significant issue in the case;

> (D) The requested DNA testing would raise a reasonable probability that the petitioner would have been acquitted if the results of DNA testing had been available at the time of conviction, in light of all the evidence in the case;

> (E) A description of the evidence to be tested and, if known, its present location, its origin and the date, time, and means of its original collection;

> (F) The results of any DNA or other biological evidence testing that was conducted previously by either the prosecution or the defense, if known;

> (G) If known, the names, addresses, and telephone numbers of all persons or entities who are known or believed to have possession of any evidence described by subparagraphs (A) through (F) of this paragraph, and any persons or entities who have provided any of the information contained in petitioner's motion, indicating which person or entity has which items of evidence or information; and

> (H) The names, addresses, and telephone numbers of all persons or entities

5

motion for a new trial under the authority of O.C.G.A. §§ 5-5-40 and 5-5-41.[6] The

Superior Court granted Gary's DNA motion. The testing proceeded and yielded

DNA evidence. Based upon this "newly discovered DNA evidence," Gary began

preparation of an extraordinary motion for new trial. The attorneys appointed

pursuant to § 3599(a)(2) to represent Gary in the District Court and at the

clemency hearing prosecuted the DNA motion and are preparing, and intend to

prosecute, his extraordinary motion for a new trial.

In these three appeals, Gary challenges three orders. Appeal No. 09-16198

arises from the District Court's denial of a motion for funds to pay two experts to

appear in person at Gary's clemency hearing, Dr. Thomas David and Mr. Roger

Morrison; Appeal No. 11-10705 involves the District Court's partial denial of a

voucher submitted by Gary's counsel for payment of services rendered in pursuing

the extraordinary motion for a new trial; and Appeal No. 11-15396 addresses the

District Court's denial of a motion for funds to pay an expert, Dr. Greg

Hampikian, to assist Gary's attorneys in connection with the DNA motion.

---

who may testify for the petitioner and a description of the subject matter
and summary of the facts to which each person or entity may testify.

[6] Georgia law requires that a motion for new trial be made before the expiration of a 30-day period from the entry of judgment. O.C.G.A. §§ 5-5-40(a), 5-5-41(a). If not made within that 30-day period, a motion for new trial shall not be "made or received unless the same is an extraordinary motion or case; and only one such extraordinary motion shall be made or allowed." Id. § 5-5-41(b).

To address these appeals, it is necessary to briefly recall the criminal conduct that led to Gary's death-row status and the rulings the District Court made in denying Gary's petition for a writ of habeas corpus, for they provide the background against which the District Court made the decisions Gary challenges.

I.

A.

Carlton Gary was convicted by a jury in Muscogee County on August 27, 1986, on three counts each of murder, rape, and burglary.[7] He was sentenced to death on each of the murder counts. The Georgia Supreme Court, in affirming his convictions and death sentence, described what led to the convictions:

> Police had no viable suspects in the case until 1984, when a gun stolen from the Wynton area in 1977 was discovered in Michigan—a consequence of that state's gun registration laws—in the possession of Carlton Gary's cousin. After further investigation, Gary was arrested for burglary on May 3, 1984. His fingerprints matched those taken from the scenes of four of the murders.
>
> Gary admitted to law enforcement officers that he was present at seven of the crime scenes (the eighth he could not remember), but claimed he was only a burglar. He blamed the murders on another[, a boyhood friend, Malvin Crittenden]. Further investigation revealed

---

[7] The victims were Ruth Schieble, Martha Thurmond, and Kathleen Woodruff. The crimes against them occurred, respectively, on October 21, October 25, and December 28, 1977. Gary v. Hall, 558 F.3d 1229, 1232–33 (11th Cir. 2009).

that in other instances in New York and in South Carolina, Gary had committed violent crimes and blamed others. For example, he raped and murdered an 89 year old woman in her home in Albany, New York in 1970. His fingerprints were found at the crime scene. Gary claimed one John Mitchell committed the murder. Mitchell, however, was acquitted by a jury. In another New York crime involving rape and burglary, Gary admitted only to being a "lookout" and blamed the rape on another. In all these cases, no evidence other than Gary's own statements and testimony supported his claim that another person was involved in the crime with him.

Gary v. State, 389 S.E.2d 218, 219–20 (Ga. 1990).[8]

B.

After the United States Supreme Court denied his petition for a writ of certiorari, Gary v. Georgia, 498 U.S. 881, 111 S. Ct. 226, 112 L. Ed. 2d 181 (1990), and the Georgia courts denied him habeas corpus relief,[9] Gary petitioned the United States District Court for the Middle District of Georgia for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Two of the claims Gary presented in his habeas petition are germane here. One was that the Georgia Supreme Court

---

[8] In addition to the three victims Gary was charged with murdering, see supra note 7, the State also introduced evidence of four other murders as proof of preparation, plan, modus operandi and identity. Those four victims and the dates of their murders were Fern Jackson, September 16, 1977; Jena Dimenstein, September 24, 1977; Mildred Borom, February 12, 1978; and Janet Cofer, April 19, 1978. Gary, 558 F.3d 1232–33. An eighth victim, Ruth Schwob, was attacked on February 11, 1978 and survived; she did not testify at Gary's trial. A ninth victim, Gertrude Miller, also survived. She was raped and beaten on September 11, 1977, and testified at Gary's trial, identifying Gary as her assailant. Id.

[9] The Superior Court for Butts County denied Gary's petition for a writ of habeas corpus, the Georgia Supreme Court denied a certificate of probable cause to appeal, and the United States Supreme Court denied certiorari review. See Gary, 558 F.3d at 1247–48.

misapplied Ake v. Oklahoma, 470 U.S. 68, 105 S. Ct. 1087, 84 L. Ed. 2d 53

(1985), in affirming the trial court's denial of his request for funds to hire a

forensic serologist; the other was that the Georgia Supreme Court erred, under

Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), in

finding that the State's failure to produce pretrial a bite-mark exemplar made from

tooth marks on one of the victim's breasts was not material to the defendant's

guilt. Gary v. Hall, 558 F.3d 1229, 1248–49 (11th Cir. 2009). Gary argued that he

needed a forensic serologist to show that he could not have been the source of the

semen found at the scenes of two of the murders for which he had been convicted

and two of the murders that had been introduced as collateral, uncharged crimes.

Similarly, he needed the bite-mark exemplar to show that the marks on another

victim's breast—the victim of one of the four uncharged crimes—were not his.[10]

> The district court held . . . hearings on Gary's [request for a forensic serologist], some of which involved the serological evidence—semen and blood—the police had found at four of the murder scenes. The evidence had been introduced at trial through the testimony of a GBI Crime Lab serologist, John Wegel, who testified that Gary may or may not have been the secretor. At one of the hearings, the district court considered the significance of Wegel's notes and work papers. Habeas counsel insisted that they could prove that Gary was not the secretor if the court provided them with funds to employ a forensic serologist to analyze Wegel's notes and work papers. The court provided counsel with $2,000 for that purpose.

---

[10] The victim was Janet Cofer. See supra note 8.

9

After counsel obtained the services of a serologist, Roger Morrison, they requested an evidentiary hearing. The court granted their request and held a hearing in which Wegel and Morrison explained and commented on the adequacy of the tests Wegel conducted in analyzing the semen. Wegel testified that the donor of the semen was a weak or non-secretor; Morrison testified that he had examined Gary's saliva and concluded that Gary was a normal secretor, implying that he could not have been the source of the semen. Wegel countered Morrison's conclusion by stating (1) that secretion levels vary over time and that eighteen years had passed between the dates the donor deposited the semen and the date of Morrison's examination, and (2) that secretion levels of semen and saliva may differ and that, while Wegel examined semen, Morrison examined saliva. At the conclusion of the hearing, habeas counsel moved the district court for funds to have Gary's semen tested by Morrison and the results of the test introduced into evidence. The court denied the motion.

Gary, 558 F.3d at 1248–49 (internal footnote omitted). We affirmed. Id. at 1254.

The District Court held an evidentiary hearing on Gary's bite-mark claim. "The court indulged the assumption that, if armed with the exemplar, defense counsel, with the assistance of a forensic odontologist, could have, at the very least, cast doubt on whether the bite marks were Gary's." Id. at 1256–57. Nonetheless, the court concluded that the unavailability of the bite mark exemplar "d[id] not undermine confidence in the verdict and sentence determined by the jury," id. (internal citation omitted), and thus denied the claim. We affirmed the court's denial of the claim. Gary, 558 F.3d at 1248–49. Our reasons for doing so

no doubt informed, at least in part, the District Court's exercise of discretion in

denying Gary's request that the District Court provide him with funds to present

the expert testimony of Dr. Thomas David at his clemency hearing.

> As for the bite mark exemplar, we . . . examine why, according to the State, the exemplar was not shown to the defense prior to trial. The exemplar was created after the body of rape and murder victim Janet Cofer was discovered on April 19, 1978. Dr. Joe Weber, a Crime Lab pathologist, while assisting Coroner Kilgore in performing an autopsy of the body the same day, observed "what appeared to be tooth marks" on the left breast. He consulted an odontologist, Dr. Carlos Galbreath, and Galbreath created an impression of the bite marks with rubber gel and a syringe. After the gel hardened, Galbreath made an exemplar of the bite mark impression, the standard procedure in dentistry for creating a permanent mold of impressions of teeth. The exemplar was stored in the Coroner's Office until July 6, 1984, when the Columbus Police Department took possession of the exemplar after Gary was taken into custody.

> Shortly after Gary's indictment, the prosecutors took the exemplar to a forensic dentist, Dr. Thomas David. He examined the exemplar and concluded that no reliable comparison could be made between the exemplar and Gary's teeth because Gary had undergone dental work since the last of the rape/murders. The prosecutors accepted Dr. David's opinion and decided against introducing the bite mark exemplar as evidence at Gary's trial. Hence, they returned the exemplar to the Coroner's Office. Although Gary's trial counsel had read the report of the Cofer autopsy and thus knew of the bite mark, they were not aware that an exemplar of the bite mark had been made or that the prosecutors were privy to Dr. David's opinion that no reliable comparison could be made between Gary's teeth and the bite mark.

> Given this, it is clear that the State, i.e., the Coroner's Office, had the bite mark exemplar and that, even with reasonable diligence,

11

defense counsel could not have obtained it. The record is unclear, however, as to whether the exemplar constituted exculpatory evidence, given the dental work Gary underwent between the time of the Cofer rape/murder and his arrest and prosecution. Moreover, it is unlikely that Gary has shown a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." [United States v.] Bagley, 473 U.S. [667,] 682, 105 S. Ct. [3375,] 3383[, 87 L. Ed. 2d 481 (1985)]. Even if Gary had access to the exemplar at trial, he could only have shown that the bite marks were inconclusive; because of the intervening dental work, any bite mark comparison would neither identify nor exclude him as the perpetrator of the Cofer crime. The jury, in fact, actually heard evidence that the bite marks were inconclusive. Dr. Weber, the State's pathologist, testified that the marks neither conclusively proved or disproved that Gary was the perpetrator. Taken in context with the other evidence, including Gary's confession that he was at the Cofer residence when she was murdered, there exists no "reasonable probability" that the admission of an inconclusive bite mark exemplar would have changed the outcome of the proceeding.

Gary, 558 F.3d at 1256–57.

C.

This brings us to the appeals at hand. We consider them in turn, starting with Appeal No. 09-16198.

II.

A.

On November 30, 2009, the United States Supreme Court denied Gary's petition to review this court's decision affirming the District Court's denial of

12

habeas relief.[11]  A few days later, the State scheduled Gary's execution for December 16, 2009, and the Board scheduled a clemency hearing for December 14, 2009.

On December 9, 2009, Gary moved the District Court for the provision of funds for two experts to appear in person at the clemency hearing, Dr. Thomas David and Roger Morrison.  His attorneys would be representing him at the clemency hearing (pursuant to their § 3599(e) appointment), and, according to his motion, the live opinion testimony of these experts was, within the intendment of § 3599(f), "reasonably necessary" to enable the attorneys to provide effective assistance of counsel at the hearing.  18 U.S.C. § 3599(f).

Gary asserted that the funds were "reasonably necessary" because Dr. David's and Roger Morrison's opinions would likely create doubt as to his guilt. He asked for $500 to enable Dr. David to appear and opine that a comparison of the bite mark exemplar taken from victim Cofer's left breast to an exemplar of Gary's teeth made it "more likely than not" that Gary was not "the person who . . . left [the] bite mark on Ms. Cofer's breast."  Gary sought $2,000 to have Morrison testify to the testing of semen samples found on other victims.  Morrison would

---

[11]  See Gary v. Hall, — U.S. —, 130 S. Ct. 742, 175 L. Ed. 2d 521 (2009).  This court received the Supreme Court's mandate on December 8, 2009, and the District Court received this court's mandate on December 11, 2009.

opine that, based on a comparison of Gary's saliva to the semen samples, Gary could not have been the secretor of the semen. Gary concluded his motion by stating that, in denying his § 2254 petition for habeas corpus relief, "this Court may have disagreed with or minimized the conclusions of [the two experts], but [their] testimony is nevertheless important for the [Board] to make its independent and quite different decision."[12]

The District Court denied Gary's motion, concluding that Gary simply wanted to relitigate in another forum the precise issues the court had rejected previously. Indeed, Gary admitted as much; he merely wanted the Board to conduct an "independent" review of the evidence the District Court had considered, hoping that the Board would reach a "quite different decision." Thus, given that Gary merely wanted to relitigate two of his habeas claims, the court found that the appearance of the two experts in person before the Board was not "reasonably necessary." He could present the Board with the transcriptions of the testimony the experts had presented in the hearings held on his § 2254 petition.

---

[12] Dr. David had appeared before the District Court at a hearing on February 14, 2007; Morrison appeared at a hearing held on November 21, 2000. The District Court had previously approved the expenditure of $7,000 for Dr. David's work and $2,000 for Morrison's.

14

Gary immediately appealed the court's ruling; meanwhile, the experts appeared at the clemency hearing on December 14.[13]

## B.

Gary argues that the District Court abused its discretion in denying the requested funds on the ground that he wanted to relitigate the bite mark and semen issues before the Board.[14]  Raising doubt as to one's guilt, he submits, is not inappropriate at a clemency hearing.  Therefore, the experts' appearance was "reasonably necessary" to effectively present that argument.

We have interpreted the § 3599(f) phrase "reasonably necessary" to mean the same as showing a "'substantial need' for the requested assistance."  Brown, 441 F.3d 1330, 1364 (11th Cir. 2006) (quoting Riley v. Dretke, 362 F.3d 302, 307 (5th Cir. 2004).  Gary contends that requiring the Board to rely on the transcripts of the testimony the experts gave during the § 2254 proceedings would prevent the Board from reaching a fully informed decision.  Live testimony was needed to determine "whether there [we]re sufficient doubts about [his] guilt" that would justify a commutation of his sentence.  The witnesses needed to appear in person

---

[13]  Based on a letter written by Gary's counsel on April 16, 2010, the experts appeared without being paid; counsel personally guaranteed payment of their fees.

[14]  We review the decision of a District Court to deny funds for court-appointed experts for abuse of discretion.  See United States v. Brown, 441 F.3d 1330, 1363 (11th Cir. 2006) (reviewing a denial of funds under a predecessor statute).

15

so that the Board could "judge [their] credibility" and "ask questions regarding

what are sometimes complicated and difficult to understand issues."

The problems Gary raises are not significant, nor are they unique to a

clemency proceeding. The decisions of courts and adjudicative bodies are

frequently made on cold records. Thus, the mere fact that the Board might have

been better able to assess the credibility of Gary's experts if they appeared in

person did not mean that their appearances were per se "reasonably necessary,"

and that testimony they previously gave under oath in an adversary proceeding

before the District Court would not suffice.[15] Indeed, the Board itself, through

regulations it has promulgated, has recognized the fact that live testimony is not

essential to its consideration of a clemency application. Under its regulations, the

Board may decide not to hold a clemency hearing at all, and may consider an

---

[15] The dissent predicts that "[t]o deny expert funding on the ground that the testimony has already been presented during the course of collateral review is to render § 3599(f) nearly meaningless," post at 3, and that this decision "requires [the] denial of the overwhelming majority of (if not all) requests for expert assistance at a clemency hearing because none will be 'reasonably necessary,'" post at 4. We are not persuaded. We are satisfied that the able district judges of this circuit will exercise their discretion based on what the prisoner says in his motion for expert assistance and the comprehensive record before the court. As we have noted, abuse of discretion review is exceedingly deferential. See Childers v. Floyd, 642 F.3d 953 (11th Cir. 2011) (en banc) (noting that under an abuse of discretion review "we may only reverse the district court's decision if it fell outside of the 'broad range of permissible conclusions.'" (citing Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 400–01, 110 S. Ct. 2447, 2458, 110 L. Ed. 2d 359 (1990))). Our judges will not read our decision as a bright line rule; rather, they will read our decision for what it is—a determination that, given the circumstances of this particular case, the denial of funds was not an abuse of discretion.

16

application for commutation on the paper record alone.  See Ga. Comp. R. &

Regs. § 475-3-.10(2)(b).

We find no abuse of discretion here.  It is apparent from Gary's submissions

to the District Court, and to this court on appeal, that the opinions Dr. David and

Morrison would express at the clemency hearing were simply a reiteration of the

opinions they gave before the District Court.[16]  In sum, we conclude that the

District Court did not abuse its discretion in concluding that Gary failed to show

that the experts' personal appearances before the Board were "reasonably

necessary" to enable his attorneys to adequately to represent him before the Board.

The District Court's decision denying the requested funds is accordingly affirmed.

### III.

Appeal No. 11-10705 arises from the denial of a "CJA 30 Death Penalty

Proceedings" fee voucher ("CJA 30" voucher) Gary's appointed counsel submitted

to the District Court on December 1, 2010.[17]  The District Court, in an order issued

---

[16]  Other circuits have concluded that where an indigent defendant seeks funding to provide testimony that is merely cumulative of evidence already in the record and when the indigent prisoner does not persuade the court that there are any particular circumstances of the case warranting in-person testimony, a District Court does not abuse its discretion in refusing to provide funds.  See Fautenberry v. Mitchell, 572 F.3d 267, 269–71 (6th Cir. 2009) (denying funds for a clemency hearing); Smith v. Dretke, 422 F.3d 269, 287–89 (5th Cir. 2005) (refusing funds for a 28 U.S.C. § 2254 proceeding).

[17]  For an example of the CJA 30 form, see U.S. Courts, CJA-0030, Death Penalty Proceedings: Appointment of and Authority to Pay Court-Appointed Counsel (last revised Feb. 2012), available at http://www.uscourts.gov/uscourts/formsandfees/forms/cja/cja30.pdf.

17

on December 10, 2010, authorized payment for 12.3 hours of work performed in connection with Gary's clemency hearing,[18] but denied payment for 16.9 hours spent researching, drafting, and revising an extraordinary motion for a new trial based on the DNA motion. Gary moved the District Court to reconsider its denial of payment for the 16.9 hours of work. The motion was denied in an order entered on January 21, 2011. Gary appeals that order.

We first must ask whether we have jurisdiction to hear this appeal. Ray v. Edwards, 725 F.2d 655, 658 n.3 (11th Cir. 1984) (stating that "[t]his court has a duty to review its jurisdiction of an appeal"). Our jurisdiction, if any, must be based on the provisions of 28 U.S.C. §§ 1291 or 1292. Section 1292 is plainly inapplicable. See 28 U.S.C. § 1292 (authorizing review of interlocutory decisions, decisions related to injunctions, receiverships or admiralty matters, and issues certified for appeal). Accordingly, if we have jurisdiction, it must lie under § 1291. Section 1291 gives the courts of appeals "jurisdiction of appeals from all final decisions of the district courts." 28 U.S.C. § 1291. The question, therefore, is whether the District Court's January 21, 2011, order is a final decision.

---

[18] Gary claimed that he was preparing a second application for clemency and that the application would be covered by § 3599. The District Court approved compensation for such preparation.

In United States v. Rodriguez, 833 F.2d 1536, 1537–38 (11th Cir. 1987), we concluded that a district court's decision denying an appointed attorney's application for compensation under the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A(d) was not a final decision reviewable under § 1291.[19] We believe that Rodriguez applies with equal force to an appointed attorney's application for compensation under § 3599(e) for several reasons. First, the procedure to approve compensation set out by each statute is essentially a mirror image of the other. Each statute gives the district court the initial and primary responsibility for appointing counsel for indigent defendants or habeas petitioners and determining the compensation counsel is to receive. Moreover, both statutes require "the chief judge of the circuit" to approve compensation in excess of the statutory limits.[20]

---

[19] Other circuits agree that CJA attorney-compensation rulings are not appealable under 28 U.S.C. § 1291. See In re Carlyle, 644 F.3d 694 (8th Cir. 2011); United States v. French, 556 F.3d 1091, 1093 (10th Cir. 2009) (observing "[e]very circuit court of appeals to consider this jurisdictional question has held that CJA fee compensation determinations made by the district court are not appealable"); United States v. Bloomer, 150 F.3d 146, 148 (2d Cir. 1998) (holding that orders concerning fee determinations for services already rendered under the CJA are not appealable); United States v. Stone, 53 F.3d 141, 143 (6th Cir. 1995); Shearin v. United States, 992 F.2d 1195, 1196 (Fed. Cir. 1993); United States v. Davis, 953 F.2d 1482, 1497 n. 21 (10th Cir. 1992); Landano v. Rafferty, 859 F.2d 301, 302 (3d Cir. 1988); United States v. Walton (In re Baker), 693 F.2d 925, 926 (9th Cir. 1982); United States v. Smith, 633 F.2d 739, 742 (7th Cir. 1980).

[20] Of course, there are some minor differences. For example, in a death-penalty appointment there is no statutory compensation maximum, interim payments are recommended, and different voucher forms are used. See 7 Guide to Judiciary Policy: Defender Services, pt. A, § 630 (last revised 2011), available at http://www.uscourts.gov/FederalCourts/AppointmentOfCounsel/Viewer.aspx?doc=/uscourts/Fed

Compare 18 U.S.C. § 3006A(d)(3) (outlining process for authorization of attorneys fees in excess of statutory cap) with 18 U.S.C. § 3599(g)(2) (describing process for authorization of expert fees in excess of statutory maximum). Second, the text and legislative history of both statutes omits any provision for the appeal of an order approving or disapproving the payment of attorney's fees. Third, the District Court's ruling under both statutes is made in an administrative, not a judicial context. Judicial decisions are rendered in an adversary proceeding. In contrast, a decision approving or disapproving a fee voucher is made without notice to any other interested party, for the court's disposition of the voucher does not turn on the outcome of the litigation between the parties. The controversy, if one exists, is between the dissatisfied attorney and the District Court.

In sum, we conclude that a District Court's partial denial of a CJA fee voucher is not a final decision for the purposes of § 1291. Appeal No. 11-10705 must be dismissed for lack of appellate jurisdiction.[21]

eralCourts/AppointmentOfCounsel/vol7/Vol_07.pdf.

[21] The dissent claims that the court "reinterprets circuit precedent to the point of nonrecognition," stating that it is important to decide "what the district court did—and did not—decide in the January 21, 2011 order at issue in Appeal No. 11-10705." Post at 7–8. We agree that it is important to be crystal clear in what was and was not decided, as well to understand the procedural posture of the dispute. As we describe in the introduction to this part, we must first understand the history behind the January 21, 2011 order. On December 1, 2010, Gary's attorneys submitted a CJA 30 voucher for their compensation. On December 10, 2010, the District Court denied part of their requested compensation. On December 23, 2010, Gary's attorneys filed a motion for reconsideration of the denial of compensation. Then, on January 21,

IV.

2011, the District Court denied part of the compensation Gary's attorneys requested. Thus, the issue before this court is whether the District Court erred in denying part of Gary's attorneys' compensation requested in the CJA 30 voucher. The issue is <u>not</u> whether the District Court erred in denying a motion by Gary to expand the scope of his appointed attorneys' representation to include the prosecution of his DNA motion and a new trial, or, alternatively, to appoint counsel to represent him in those proceedings. In the plainest of terms, this is a case about <u>Gary's attorneys</u> seeking compensation, not <u>Gary</u> seeking representation.

The dissent implies that we should disregard the procedural posture of the case. Even though the District Court's decision was an otherwise non reviewable CJA-voucher compensation decision, such a decision can morph into a reviewable denial of Gary's right to representation, the dissent implicitly argues, because of the reason given to deny Gary's attorneys' compensation. The dissent highlights two controlling cases—<u>Harbison v. Bell</u>, 556 U.S. 180, 129 S. Ct. 1481, 173 L. Ed. 2d 347 (2009) and <u>In re Lindsey</u>, 875 F.2d 1502 (11th Cir. 1989) (per curiam)—where the orders are "practically indistinguishable" from the CJA denial at issue here. <u>Post</u> at 10.

Such reliance is misplaced. Indeed, to realize why these cases actually support our understanding, we must ask this question: what was the procedural posture in those two cases? In <u>Harbison</u>, the motion at issue was filed in a live controversy and was entitled, "Request for Leave to Expand Appointment Order." <u>See Harbison v. Bell</u>, 1:97-CV-52, 2007 WL 128954, at *1 (E.D. Tenn. Jan. 16, 2007). Likewise, in <u>In Re Lindsey</u>, the motion was styled as a "MOTION FOR STAY OF EXECUTION AND FOR APPOINTMENT OF COUNSEL." <u>See In re Lindsey</u>, 875 F.2d at 1503. Both cases involved a request <u>by the indigent defendant</u> for representation, not their attorneys for compensation. Both cases were reviewable because the prisoner's rights were placed squarely at issue by the prisoner himself.

<u>Rodriguez</u> decided that CJA compensation decisions are not appealable. <u>See United States v. Rodriguez</u>, 833 F.2d 1536, 1537–38 (11th Cir. 1987) (per curiam). The decision at issue here is a compensation decision, plain and simple. A prisoner's claim pertaining to the scope of his or her statutory entitlement to representation can easily be presented to the District Court in a motion for appointment of counsel or to expand the scope of representation, just as the petitioners in <u>Harbison</u> and <u>In Re Lindsey</u> did. That procedural posture, though, is simply not what we have in Appeal No. 11-10705. The dissent thought it strange, <u>post</u> at 16, that we had jurisdiction to review the denial of expert assistance, but not the partial denial of the CJA fee determination, even though the merits of both turned on the scope of § 3599. As we explain in note 26 <u>infra</u>, however, the motion at issue in Appeal No. 11-15396 was properly presented to the District Court in a motion filed by Gary <u>asserting his rights</u> to additional funds to expand the previous appointment of his expert. We have jurisdiction to review a final determination of Gary's rights, but do not have jurisdiction to review a CJA fee determination rooted in his attorney's right to compensation. There is no paradox about this disparate treatment.

21

We now address Appeal No. 11-15396. Gary moved the Superior Court of Muscogee County, pursuant to O.C.G.A. § 5-5-41(c), to order DNA testing of vaginal contents or vaginal washings obtained from some of the victims.[22] On February 19, 2010, the Superior Court ordered limited DNA testing of samples taken from three victims.[23] On May 24, 2010, Gary asked the District Court to provide funds pursuant to § 3599(f) for a DNA expert, Dr. Greg Hampikian, to assist counsel in moving the Superior Court to order additional DNA testing. On June 4, 2010, the District Court entered an order providing funds not to exceed $7,500 to pay Dr. Hampikian. On August 19, 2011, Gary asked the District Court to provide an additional $3,500 for Dr. Hampikian in anticipation of the Superior Court's authorization of another round of DNA testing.[24] The District Court denied this request. The court concluded that, in light of the Supreme Court's decision in <u>Harbison v. Bell</u>, 556 U.S. 180, 129 S. Ct. 1481, 173 L. Ed. 2d 347 (2009), the DNA testing ordered by the Superior Court pursuant to O.C.G.A. § 5-

---

[22] The victims are identified in notes 7 and 8, <u>supra</u>.

[23] The Superior Court ordered tests of the following items: a slide from a vaginal washing of Jean Dimenstein, a swab of Martha Thurmond's abdomen, a slide from a vaginal washing of Martha Thurmond, and a slide from vaginal contents of Kathleen Woodruff.

[24] On August 25, 2011, the Superior Court ordered DNA testing of the following items found at the scene of Gertrude Miller's rape and beating: a white sleeping gown, underclothing, and a white slip. Gertrude Miller survived the attack and testified at Gary's trial, identifying him as her assailant. <u>See</u> <u>supra</u> note 8.

22

5-41(c) was not a post-conviction process covered by § 3599(e), even though Gary filed the motion subsequent to the initiation of his § 2254 case. Thus, since the DNA Motion was outside the scope of Gary's lawyers' § 3599(a)(2) appointment, the lawyers could not obtain funds pursuant to § 3599(f) for Dr. Hampikian's services.[25]

Gary appeals the District Court's decision, arguing that the denial of funds for the expert denies him the effective assistance of counsel in obtaining the DNA testing in the Superior Court of Muscogee County, a post-conviction proceeding he claims is within the intendment of § 3599. We have jurisdiction to entertain his

---

[25] In its order denying Gary's request for additional funding, the District Court indicated that, on June 4, 2010, it approved funding for Dr. Hampikian with the expectation that Gary was preparing to file a second application for clemency and, to assist counsel in such preparation, would seek funds for expert services under § 3599(f). A second application for clemency was not forthcoming, however, so the District Court concluded that Gary wanted the additional funding to finance his motion for a new trial.

appeal.[26]  We review the District Court's interpretation of § 3599 <u>de novo</u>.  <u>See</u>

<u>United States v. Dodge</u>, 597 F.3d 1347, 1350 (11th Cir. 2010) (en banc).

A.

As in all cases involving the interpretation of a statute, we begin with the

language employed by Congress.  <u>See</u> <u>Hardt v. Reliance Standard Life Ins. Co.</u>,

560 U.S. ——, ——, 130 S. Ct. 2149, 2156, 176 L. Ed. 2d 998 (2010).  Here, the

language of the statute is indeed broad.  Section 3599 authorizes the appointment

---

[26]  After appointing counsel pursuant to § 3599(a)(2), the District Court retains jurisdiction to monitor the appointment administratively, until such time as the prisoner is no longer entitled to representation in a post-habeas case proceeding designated in § 3599(e), <u>see</u> <u>supra</u> note 2.  Compensation issues that arise ancillary to the counsel's § 3599(a)(2) appointment, including the approval of CJA 30 vouchers for attorney's fees and the approval funding of "reasonably necessary" expert services provided by § 3599(f), are examples of issues the District Court retains power to consider.  The case remains live for that limited purpose.

This appeal is of the denial of a motion filed <u>by Gary</u>, asserting <u>his right</u> under § 3599(f) for the District Court to provide funds for services Gary believes are "reasonably necessary" to assist his lawyers in prosecuting his motion for DNA testing in the Superior Court of Muscogee County.  Gary properly asserted his right in a motion before the District Court.  <u>Cf.</u> <u>supra</u> note 21. Gary also implicitly argued to the District Court that, in addition to the provision of funds to pay for the services of an expert under § 3599(f), the District Court should also expand his lawyers' § 3599(a)(2) appointment in the federal habeas case to include the state proceedings.  The District Court disagreed on both fronts.  Thus, in appealing the District Court's denial of § 3599(f) funds to hire Dr. Hampikian, Gary also effectively appealed the District Court's refusal to expand the scope of the § 3599(a)(2) appointment that would have allowed his lawyers to represent him before the Superior Court.

In sum, we conclude that the District Court had retained jurisdiction to determine the scope of duties encompassed under the § 3599(a)(2) appointment and the availability of expert funds under § 3599(f), and whether the DNA motion fell within that ambit of representation.  We have jurisdiction under 28 U.S.C. § 1291 to review the District Court's determination on Gary's motion, which is a final decision.  <u>See</u> <u>Harbison v. Bell</u>, 556 U.S. 180, 183, 129 S. Ct. 1481, 1485, 173 L. Ed. 2d 347 (2009) (holding that a district court's denial of representation for an indigent prisoner contending that he has a statutory right to representation is a final appealable order under § 1291).

of counsel for an indigent prisoner who seeks a writ of habeas corpus setting aside a death sentence, see 18 U.S.C. § 3599(a)(2), and requires that counsel continue to represent the prisoner "throughout every subsequent stage of available judicial proceedings," including "all available post-conviction process," id. § 3599(e) (emphasis added).

The Supreme Court had occasion to interpret this statute in Harbison v. Bell. In Harbison, the Court said that § 3599 provides indigent defendants with "federally appointed counsel to represent their clients in state clemency proceedings and entitles them to compensation for that representation." 556 U.S. at 194, 129 S. Ct. at 1491. Significantly, however, the Court read the language of § 3599 to limit the right to federally-funded representation in several important ways.[27] The Court found that the language of § 3599(e) listed responsibilities of appointed counsel sequentially, concluding that an indigent prisoner is entitled to counsel's representation only for those judicial proceedings that ordinarily occur

---

[27] Two limitations that are not relevant here are: (1) if his conviction or death sentence is set aside, the prisoner is not entitled to the appointment of counsel under § 3599 for retrial in state court, despite the fact that the retrial would occur subsequent to the conclusion of the prisoner's federal habeas case, Harbison v. Bell, 556 U.S. at 189, 129 S. Ct. at 1488 ("We do not read [§ 3599](e) to apply to state-court proceedings that follow the issuance of a federal writ of habeas corpus."); and (2) if the State provides counsel for any proceeding otherwise covered by § 3599, federal funding is not available, id. ("[S]ubsection (a)(2) provides for counsel only when a state petitioner is unable to obtain adequate representation.").

subsequent to counsel's appointment. Id. at 188, 129 S. Ct. at 1488. The Court

reasoned

> when [counsel] is appointed pursuant to (a)(2), [counsel's]
> representation begins with the § 2254 or § 2255 "post-conviction
> process." Thus, counsel's representation includes only those judicial
> proceedings transpiring "subsequent" to her appointment. It is the
> sequential organization of the statute and the term "subsequent" that
> circumscribe counsel's representation . . . .

Id. For counsel appointed to represent an indigent § 2254 petitioner, such as Gary,

the relevant starting point is the filing of the habeas petition—an indigent

petitioner standing in Gary's shoes may receive § 3599 funding only for those

proceedings that ordinarily occur subsequent to that starting point.

Elaborating on this limitation, the Court emphasized that an indigent habeas

petitioner is not entitled to representation for all proceedings that occur subsequent

to his attorney's appointment. Id. at 189–90, 129 S. Ct. at 1488–89. Specifically,

the Court discussed a situation where a state proceeding that ordinarily occurs

before the filing of a federal habeas petition occurs afterward instead. Such a

proceeding, although initiated subsequent to the filing of the federal habeas

petition, is not within the scope of § 3599 funding. The Court explained:

> The Government likewise argues that our reading of § 3599(e) would
> require federally funded counsel to represent her client in any state
> habeas proceeding occurring after her appointment because such
> proceedings are also "available post-conviction process." But as we

26

have previously noted, subsection (e) authorizes counsel to represent her client in "subsequent" stages of available judicial proceedings. State habeas is not a stage "subsequent" to federal habeas. Just the opposite: Petitioners must exhaust their claims in state court before seeking federal habeas relief. That state postconviction litigation sometimes follows the initiation of federal habeas because a petitioner has failed to exhaust does not change the order of proceedings contemplated by the statute.

Id. (internal citation omitted).

The Court noted, however, that the language of the statute does contemplate some limited federal funding of counsel in state court proceedings. In one footnote, the Court stated that the "other appropriate motions and procedures" language in § 3599(e) indicated that a District Court may determine that counsel appointed to represent a habeas petitioner may need to "exhaust a [federal constitutional] claim [in state court] in the course of her federal habeas representation" and may be compensated for such work. Id. at 190 n.7, 129 S. Ct. at 1489 n.7. The Court was equally quick to note, though, that "[t]his is not the same as classifying state habeas proceedings as 'available post-conviction process' within the meaning of the statute." Id.

Gary disagrees, arguing for a broader reading of § 3599 and Harbison. His position is that the filing of the DNA motion is a "subsequent stage of a judicial proceeding" and "post-conviction process." It follows, he says, that because

27

§ 3599 requires that counsel be afforded for "every" subsequent stage of available judicial proceedings and for "all" available post-conviction process, he has a right to federally funded counsel and expert assistance for this motion.

B.

We decline to adopt such a broad interpretation and conclude, instead, that § 3599 does not provide for federally-funded counsel to assist someone standing in Gary's shoes in pursuing a DNA motion, the results of which might serve as the basis for an extraordinary motion for a new trial. As the language of § 3599(e) and the Court's opinion in Harbison indicate, federally-funded counsel is available only for certain subsequent proceedings. A state court motion for DNA testing does not ordinarily follow the commencement of a federal habeas action and is, therefore, not a subsequent proceeding contemplated by § 3599(e), even when filed after the prisoner's federal habeas case has concluded. The District Court, therefore, properly denied Gary's motion for funds to pay for an expert to assist counsel in pursuing DNA testing.

Clemency proceedings and hearings on DNA motions are fundamentally different types of proceedings and should be treated differently for purposes of § 3599(a)(2). A clemency proceeding, by its nature, will typically occur subsequent to the prisoner's unsuccessful collateral attack on the constitutional

28

validity of his conviction or death sentence. See Ga. Comp. R. & Regs. § 475-3-.10(2)(b) ("Th[e] [clemency] decision will be made after it appears that all appeals through the courts have ceased or been exhausted or anytime within 72 hours of the earliest time the execution could take place even if court action is still pending.").[28] The "fail safe in our criminal justice system," Herrera v. Collins, 506 U.S. 390, 415, 113 S. Ct. 853, 868, 122 L. Ed. 2d 203 (1993) (internal quotation marks omitted), clemency is a proceeding of last resort for a prisoner before execution. It is, therefore, a unique species of proceeding that is typically subsequent to the conclusion of a § 2254 proceeding.[29]

_____

[28] An execution could not go forward until the federal courts have considered and disposed of the prisoner's petition for a writ of habeas corpus. See Lonchar v. Thomas, 517 U.S. 314, 320, 116 S. Ct. 1293, 1297, 134 L. Ed. 2d 440 (1996) ("If the district court cannot dismiss the [habeas] petition on the merits before the scheduled execution, it is obligated to address the merits and must issue a stay to prevent the case from becoming moot."). A clemency proceeding in Georgia, at a minimum, cannot be held until after the prisoner has been denied habeas relief.

[29] The dissent claims that a motion for a new trial is like a clemency hearing in that each presents "a final chance to rectify any fundamental miscarriage of justice." Post at 21. The dissent continues, noting that extraordinary motions for a new trial can be filed "at any time after the expiration of the thirty-day statutory period," id. at 23 (emphasis omitted), and are "typically" filed after the prisoner has been denied federal habeas relief, id. at 20. The dissent concludes that, as a result, the two are alike in that "[t]he most appropriate time for an individual to file one of these motions would undoubtedly be after all the evidence has been investigated, the facts developed, and the arguments made in the traditional channels of review (i.e. state postconviction and federal habeas proceedings)." Id. (emphasis omitted). In taking this view, the dissent draws an indefensible parallel between an extraordinary motion for a new trial and a clemency proceeding.
    A clemency proceeding is, as the Supreme Court observed, a final chance to rectify any fundamental miscarriage of justice. See Herrera v. Collins, 506 U.S. 390, 415, 113 S. Ct. 853, 868, 122 L. Ed. 2d 203 (1993); see also Utah Admin. Code r. 671-312-3(5) (allowing for a second clemency review, despite an earlier proceeding); David Schwartz, Arizona Executes

29

Killer Who Fought Clemency Board, Chi. Trib., June 27, 2012,
http://articles.chicagotribune.com/2012-06-27/news/sns-rt-us-usa-execution-arizonabre85q1cm-2
0120627_1_estafana-holmes-clemency-board-reprieve (noting that the Arizona clemency board
rejected the inmate's application on the Friday preceding his execution); Andrew
Welsh-Huggins, Gov. Kasich Grants Two-Week Reprieve to Death-row Inmate, News-
Messenger (Fremont, Ohio), June 6, 2012,
http://www.thenews-messenger.com/article/20120606/NEWS01/206060312/Gov-Kasich-grants-t
wo-week-reprieve-death-row-inmate (stating that the Ohio Parole Board voted against mercy in
the month preceding the execution date); Mississippi Gov. Phil Bryant Won't Stop Execution for
1990 Slayings, Gulflive.com, June 05, 2012,
http://blog.gulflive.com/mississippi-press-news/2012/06/mississippi_gov_phil_bryant_wo.html
(reporting that the Governor of Mississippi refused mercy on the afternoon of the execution
date).

An extraordinary motion for a new trial is entirely different.  Georgia law, for example, is clear in that an extraordinary motion for a new trial is subject to stringent limitations and cannot be used as a "final" chance for relief.

> The statutes which control extraordinary motions for new trial based on newly
> discovered evidence require a defendant to act without delay in bringing such a
> motion. OCGA §§ 5–5–23 and 5–5–41 (Code Ann. §§ 70–204 and 70–303). The
> obvious reason for this requirement is that litigation must come to an end.

Drane v. State, — S.E.2d —, 2012 WL 2369437, at *5 (Ga. 2012) (quoting Llewellyn v. State, 314 S.E.2d 227, 229 (Ga. 1984); see also Davis v. State, 660 S.E.2d 354, 359 (Ga. 2008)  ("Thus, it appears that Davis has not been diligent in presenting these affidavits to the trial court, which is another of the requirements in an extraordinary motion for new trial."); Llewellyn, 314 S.E.2d at 229 (Ga. 1984) (requiring both due diligence to discover the information and prompt filing of the motion once information is in hand).  Other States provide different post-conviction procedures for seeking a new trial based on newly-discovered evidence; such procedures must be invoked promptly, after the new evidence has been discovered.  See, e.g., Ala. R. Crim. P. 32.1(e)(1) (providing that an individual can bring a newly-discovered evidence claim if "[t]he facts relied upon were not known by the petitioner or the petitioner's counsel at the time of trial or sentencing or in time to file a posttrial motion pursuant to Rule 24, or in time to be included in any previous collateral proceeding and could not have been discovered by any of those times through the exercise of reasonable diligence"); Ky. R. Crim. P. 10.06(a) ("The motion for a new trial shall be served not later than five (5) days after return of the verdict.  A motion for a new trial based upon the ground of newly discovered evidence shall be made within one (1) year after the entry of the judgment or at a later time if the court for good cause so permits."); Fields v. State, 253 P.3d 692, 699 (Idaho 2011) (describing post-conviction procedure to bring a newly-discovered evidence claim and noting that "[the defendant] was required to bring those claims within a reasonable time after they were known or should have been known.  Claims not raised within that reasonable time are deemed waived" (citation omitted)); State v. Unsworth, 2010 WL

30

The nature and purpose of a DNA motion, however, is quite different. A motion for DNA testing under O.C.G.A. § 5-5-41(c) is generally filed in conjunction with an extraordinary motion for a new trial pursuant to O.C.G.A. § 5-5-41(a) once the thirty-day window for filing a new trial motion has closed. Nothing in the enabling statute, however, requires that the prisoner defer filing his motion for DNA testing and a new trial and until after his state and federal collateral attacks on his conviction (or sentence), if any, have run their course. To the contrary, a prisoner may move for DNA testing and a new trial at any time after thirty days have elapsed from the entry of judgment, so long as the prisoner presents "some good reason . . . why the motion was not made during such [thirty-

---

415415, at *2 (Ohio Ct. App. 2010) ("Although [Ohio R. Crim. P. 33(B)] itself does not provide a specific time limit for the filing of a motion for leave to file a delayed motion for new trial, [a] trial court may require a defendant to file his motion for leave to file within a reasonable time after he discovers the evidence." (alteration in original) (internal quotation marks omitted)).

Thus, unlike a clemency proceeding, which commonly occurs as a final chance to prevent a miscarriage of justice, the time for filing a motion for a new trial based on newly discovered evidence depends entirely on when the prisoner discovered the evidence. It is simply incorrect to assert that an extraordinary motion for a new trial is "typically" filed after a federal habeas petition or that an extraordinary motion for a new trial would be held in reserve as a measure of last resort. On the other hand, a prisoner who obtains evidence that would support a clemency application can sit on that evidence until the last possible moment. In sum, if a prisoner discovers new evidence that might prompt the court in which he was convicted and sentenced to grant a new trial (or a new sentencing hearing), the prisoner must act with dispatch. This means that if, after filing a § 2254 petition, a prisoner discovers evidence that would warrant the granting of a new trial, the prisoner runs the risk of having his motion for new trial declared untimely if he does not file his motion immediately.

day] period" and satisfies the requirement that the motion for a new trial is "extraordinary."[30] See O.C.G.A. §§ 5-5-41(a)–(b). Thus, unlike a clemency proceeding, there is nothing inherent in a state trial court's entertainment and consideration of a motion for DNA testing or an extraordinary motion for new trial that indicates such a motion ordinarily follows the commencement of a federal habeas petition. In deciding whether Congress intended that § 3599 provide the basis for funding the prosecution of Gary's motions for DNA testing and for a new trial, we do not consider, because it is irrelevant, that Gary waited to file those motions until after the United States Supreme Court denied review of this courts' affirmance of the District Court's decision denying § 2254 relief. In sum, a DNA motion and an extraordinary motion for a new trial do not ordinarily follow the appointment of counsel in a federal habeas petition and thus are not subject to funding under § 3599.

---

[30] In cases like Gary's, where DNA testing was not available at the time of conviction, such a showing is not likely to be difficult. There are additional restrictions on when a motion may be filed. See Daniel's Georgia Criminal Trial Practice § 28-12 (2011–2012 ed.) (noting that "[t]he usual ground stated for the filing of an extraordinary motion for a new trial is the discovery of newly found evidence" and listing six requirements that a movant must show, including that "'it was not owing to the want of due diligence that he did not acquire it sooner'" (quoting Timberlake v. State, 271 S. E. 2d 792, 795 (1980)); see also O.C.G.A. § 5-5-23 ("A new trial may be granted in any case where any material evidence, not merely cumulative or impeaching in its character but relating to new and material facts, is discovered by the applicant after the rendition of a verdict against him and is brought to the notice of the court within the time allowed by law for entertaining a motion for a new trial.").

Gary relies on a footnote in <u>Harbison</u> in arguing that § 3599 could provide

for federal representation in a state court proceeding commenced by a prisoner

after he has petitioned a federal district court for a writ of habeas corpus.  The

footnote reads, in full:

> Pursuant to § 3599(e)'s provision that counsel may represent her
> client in "other appropriate motions and procedures," a district court
> may determine on a case-by-case basis that it is appropriate for
> federal counsel to exhaust a claim in the course of her federal habeas
> representation.  This is not the same as classifying state habeas
> proceedings as "available post-conviction process" within the
> meaning of the statute.

556 U.S. at 190 n.7, 129 S. Ct. at 1489 n.7.

The Court is describing a scenario in which the prisoner has filed a mixed

§ 2254 petition, in that it contains constitutional claims that have been exhausted

in state court as well as claims that have not been exhausted <u>and</u> the state courts

would still entertain them.  In this scenario, the district court is likely to stay the

litigation of the habeas case while the prisoner repairs to state court to exhaust the

unexhausted claim.  Footnote 7 simply acknowledges that the district court, in the

exercise of its discretion, may authorize § 3599 counsel to prosecute the

unexhausted claim in state court.

This case at hand clearly does not present the scenario contemplated by that

footnote.  It is one thing for a district court to determine, in its discretion, that it is

33

necessary for court-appointed counsel to "exhaust a claim [in state court] in the course of her federal habeas representation," id., so that counsel can go forward with her prosecution of the prisoner's federal habeas petition. It is quite another matter, however, for an indigent prisoner to expect federally-funded counsel to initiate an entirely new state court proceeding to obtain relief from a conviction and death sentence on a state law ground—in Gary's case, on the ground of newly discovered evidence. The filing of Gary's DNA motion had nothing to do with "exhaust[ing]" a federal constitutional claim in state court so that the District Court could consider it on the merits in adjudicating Gary's § 2254 petition. Gary's claim that he is entitled to DNA testing as a matter of Georgia law was not, and could not have been, included as a claim in his § 2254 petition.

Finally, we note that there are sound policy reasons why Congress would not provide for federally-funded counsel in independent state court proceedings. Two reasons stand out: first, such funding would raise troubling federalism concerns; and second, the funding would create significant practical problems. The Supreme Court has explained on numerous occasions the importance of "the fundamental policy against federal interference with state criminal prosecutions," Younger v. Harris, 401 U.S. 37, 46, 91 S. Ct. 746, 751, 27 L. Ed. 2d 669 (1971), and emphasized that "the States' interest in administering their criminal justice

34

systems free from federal interference" is a critical concern of federalism. See

Kelly v. Robinson, 479 U.S. 36, 49, 107 S. Ct. 353, 361, 93 L. Ed. 2d 216 (1986);

see also Arizona v. Manypenny, 451 U.S. 232, 243, 101 S. Ct. 1655, 1665, 68 L.

Ed. 2d 58 (1981) ("Because the regulation of crime is pre-eminently a matter for

the States, we have identified 'a strong judicial policy against federal interference

with state criminal proceedings.'" (quoting Huffman v. Pursue, Ltd., 420 U.S. 592,

600, 95 S. Ct. 1200, 1206, 43 L. Ed. 2d 482 (1975))). Proper respect for the

principles of federalism is no less important in the context of federal habeas

review of a state prisoner's death sentence.[31] See Coleman v. Thompson, 501 U.S.

722, 726, 111 S. Ct. 2546, 2552, 115 L. Ed. 2d 640 (1991) ("This is a case about

federalism. It concerns the respect that federal courts owe the States and the

States' procedural rules when reviewing the claims of state prisoners in federal

habeas corpus."). Providing court-appointed counsel to prisoners challenging

their convictions in state court after they have been denied § 2254 relief would put

---

[31] The dissent claims that the Supreme Court has dismissed federalism as a reason for concern. See post at 26. Surely, it is beyond serious dispute that the potential interference arising from close federal supervision over state court proceedings pertaining to an extraordinary motion for a new trial—a proceeding that may last for a significant period of time—presents far more compelling reasons to be concerned than the risk of federal interference with a single clemency board review that may or may not even involve a single hearing. This is yet another illustration of the substantial differences between a clemency proceeding, on the one hand, and an extraordinary motion for a new trial containing issues that have not been presented to the district court on the other.

the district courts in the position of overseeing, and thus indirectly managing, counsel's performance in the state court proceeding. Interference, or at least the appearance of interference, would be inevitable. This could occur in various contexts, including when a district court (1) reviews counsel's CJA 30 vouchers to determine the reasonableness of the requests for compensation; (2) acts on counsel's motions, pursuant to § 3599(f), for the provision of investigative, expert, or other services "reasonably necessary" for counsel's representation of the prisoner; (3) rules on counsel's motion to withdraw from the prisoner's representation; or (4) considers a prisoner's motion to discharge counsel and appoint substitute counsel. Moreover, as a practical concern, in order to pass on the merits of any of these motions or requests, a district judge would have to become acquainted with the issues presented in the state court proceeding despite the fact that the judge may not have confronted them—either directly or indirectly—in adjudicating the prisoner's habeas claims.

Based on our reading of § 3599, the language of Harbison clearly limiting the provision of federally-funded counsel, and obvious public policy concerns, we conclude that § 3599 does not provide for the appointment of counsel to prosecute the state post-conviction motion pending in the Superior Court of Muscogee County.

V.

For the reasons set out above, we DISMISS Appeal No. 11-10705, and we AFFIRM the District Court's decision in Appeals Nos. 09-16198 and 11-15396.

SO ORDERED.

WILSON, Circuit Judge, dissenting:

The majority's disposition of this case delivers a powerful blow to the far-reaching guarantees of representation and expert assistance embodied in 18 U.S.C. § 3599. In the course of the opinion, it unnecessarily forecloses expert funding for practically any individual represented by § 3599 counsel, misstates this circuit's jurisdictional precedent, and misinterprets the scope of a federal statute. I cannot join in its disposition of these appeals.

I

Gary sought to utilize the clemency hearing to cast doubt on his guilt for the charged crimes. The means by which this could be accomplished entailed the presentation of medical testimony that neither (1) the bite mark on one victim nor (2) the semen found on another victim was consistent with Gary being the perpetrator. The two experts, Gary contends, would testify at the hearing to the high probability that those pieces of evidence were inconsistent with Gary's biology. Because the majority finds that the request for experts merely encompassed "reiteration of the opinions [the experts] gave before the District Court," it concludes that the experts were not reasonably necessary to the clemency-hearing representation. Maj. Op. at 18. This holding fails to appreciate the unique character of clemency, as opposed to federal habeas, and broadly

38

forecloses funding for expert testimony that has previously been presented to any court.

The clemency board's "view of a case necessarily differs from that of a local court or law enforcement agency." Georgia State Board of Pardons and Paroles, Clemency, http://www.pap.state.ga.us/opencms/export/sites/default/clemency/ (last visited June 18, 2012); *see also Ohio Adult Parol Auth. v. Woodard*, 523 U.S. 272, 284, 118 S. Ct. 1244, 1251 (1998) (plurality opinion) (recognizing the differences between judicial and clemency proceedings). Clemency proceedings operate unconstrained by the strictures of AEDPA and federal rules of evidence and procedure. Unlike the federal courts, the clemency board can base its decision on information never presented to state courts for adjudication. That consideration is particularly relevant where, as here, the factual basis of an argument has been developed almost exclusively in federal court.[1] *See Cullen v. Pinholster*, 563 U.S.

---

[1] During federal habeas proceedings, we reviewed the potential exculpatory impact of the bite-mark exemplar but did not examine the value (if any) of the other testing requested. For Gary's claims under *Ake v. Oklahoma*, 470 U.S. 68, 105 S. Ct. 1087 (1985), which concerned the request for serological testing, we concluded that he was not entitled to relief because the denial of expert services was essentially a determination of state law unreviewable on federal habeas. *Gary v. Hall*, 558 F.3d 1229, 1251 n.37 (11th Cir. 2009) ("[W]hether Gary was entitled to funds for the employment of a serologist was a matter of state law."); *id.* at 1254 ("Gary's denial-of-funds claim did not present a federal constitutional question, and the district court should not have entertained it."). For Gary's claim under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963), we ruled that the bite-mark exemplar was inconclusive and, therefore, not material to the outcome of the trial. *Gary*, 558 F.3d at 1257.

___, 131 S. Ct. 1388, 1398 (2011) ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."). The clemency board obtains an accurate portrayal of the expert opinions by asking questions without concern for federal evidentiary rules, by judging the credibility of the experts, and then by weighing their conclusions against the other facts and testimony from the course of proceedings. The clemency board, unlike the courts, is not chained to the credibility findings of any prior adjudicative body. *See Louis v. Blackburn*, 630 F.2d 1105, 1109 (5th Cir. 1980) ("One of the most important principles in our judicial system is the deference given to the finder of fact who hears the live testimony of witnesses because of his opportunity to judge the credibility of those witnesses."). The clemency process has been set apart as "provid[ing] the 'fail safe' in our criminal justice system" when traditional channels of review are exhausted, *Herrera v. Collins*, 506 U.S. 390, 415, 113 S. Ct. 853, 868 (1993), and its independent nature necessarily fosters this role as the final stop before execution of a capital sentence.

To deny expert funding on the ground that the testimony has already been presented during the course of collateral review is to render § 3599(f) nearly meaningless. The majority holds that expert services are not "reasonably necessary" for representation in a clemency proceeding because that testimony is

40

available in the form of a transcript. But won't this always be the case? The

substantive-type claims for which experts are requested will almost certainly have

served as a ground for relief in state postconviction and federal habeas

proceedings, and transcripts of that testimony would be available to a clemency

petitioner. A death-sentenced inmate would be ill advised to hold on to potentially

meritorious claims in hopes that they could serve as the basis of a compelling

clemency petition. The majority's reasoning on this point requires denial of the

overwhelming majority of (if not all) requests for expert assistance at a clemency

hearing because none will be "reasonably necessary." And it is particularly unjust

here, as Gary had no indication that during federal habeas proceedings his counsel

should be developing testimony for an actual innocence claim to present to a

clemency board.[2] The majority's interpretation renders § 3599(f)'s authorization

for expert services meaningless—no indigent death-sentenced petitioner can meet

the "reasonably necessary" threshold to even be considered for funding.

    In a footnote, the majority recognizes two cases as disposing of a similar

issue involving duplicative testimony. Neither offers a convincing parallel to the

---

[2] At the time this expert testimony was developed, *Harbison* had not been decided, and controlling Eleventh Circuit precedent did not extend appointed counsel's representation to clemency proceedings. *See King v. Moore*, 312 F.3d 1365, 1365–66 (11th Cir. 2002) (per curiam).

issue we confront.  The majority points to *Fautenberry v. Mitchell*, 572 F.3d 267,

269–71 (6th Cir. 2009), as affirming the district court on the ground that the

evidence was cumulative.  Maj. Op. at 18 n.16.  The district court in that case

"concluded . . . that the service requested was not 'reasonably necessary' because

Fautenberry had provided no reasons to explain why it would be necessary."  *Id.* at

269.  The Sixth Circuit likewise held that, based on the petitioner's failure to put

before the district court *any argument* regarding reasonable necessity, there was

no abuse of discretion notwithstanding his relevant arguments to the court of

appeals.  *Id.* at 270 (explaining that Fautenberry "did not argue to the district

court" the reasonable necessity of the services); *id.* at 272 (Moore, J., concurring)

("The majority is correct . . . that Fautenberry did not present this argument to the

district court.  I therefore cannot say that the district judge abused his discretion

based on the record before him.").  A fair reading of that case reveals that the

court's affirmance is not dependent on the cumulative nature of the expert services

requested.  Nor is *Smith v. Dretke* persuasive, as that case found that expert

testimony requested for use in federal habeas proceedings was supplementary to

that already presented to the state court.  422 F.3d 269, 288–89 (5th Cir. 2005).

As explained above, federal habeas proceedings necessarily involve a different

inquiry than clemency, which can consider a wealth of information above that of

42

federal courts. *Smith* is therefore uninformative to our the determination of what is "reasonably necessary" for representation in a state clemency proceeding.

In arriving at its conclusion, the majority construes the statutory phrase "reasonably necessary" to require a "substantial need" for the requested expert services. *See* Maj. Op. at 16. This standard is derived from Fifth Circuit case law, *e.g. Riley v. Dretke*, 362 F.3d 302, 307 (5th Cir. 2004), which we cited in *United States v. Brown*, 441 F.3d 1330, 1364 (11th Cir. 2006). In *Brown*, although we identified that "the Fifth Circuit has held that the statute requires the defendant to demonstrate 'substantial need' for the requested assistance," 441 F.3d at 1364, we did not utilize the "substantial need" standard to decide that appeal. Nor did we even mention the word substantial in the context of evaluating the claim. *See id.* at 1363–65. Circuit precedent therefore does not require application of this standard, and I do not read the majority opinion here to actually invoke that standard, since it makes an appearance only in passing.[3] Nor should it do so, as elevating the standard from "reasonable" to "substantial" implies that the movant must carry a heavier burden than that contemplated by the statute.

---

[3] The Fifth Circuit has not applied this standard in a published opinion after *Riley*, nor have we acknowledged it in any case other than *Brown*.

I do not by any means imply that expert testimony is always "reasonably necessary" to representation of a clemency petitioner. But I cannot justify depriving a death-sentenced individual of live, unconstrained, expert testimony on the ground that reciting it from a transcript is an adequate substitute. The duty of the clemency board is to make an independent determination about the sentence that has been handed down to the petitioner, and I believe that the expert testimony seeking to cast doubt on Gary's role in the crimes is reasonably necessary for representation in that proceeding. At the same time, I recognize that under the terms of the statute, the district court could find that expert services were reasonably necessary for representation but nevertheless deny funding. *See* 18 U.S.C. § 3599(f) ("Upon a finding that . . . expert . . . services are reasonably necessary for the representation of the defendant, . . . the court *may* authorize the defendant's attorneys to obtain such services . . . ." (emphasis added)). I would thus vacate the district court's order and remand to the district court to determine whether it will exercise its discretion to allow funding for these reasonably necessary services.

## II

Next, in concluding that we lack jurisdiction to review the district court's order denying reconsideration of its denial of funding, the majority reinterprets

44

circuit precedent to the point of nonrecognition. At the outset, I must clarify what the district court did—and did not—decide in its January 21, 2011 order at issue in Appeal No. 11-10705. The district court interpreted 18 U.S.C. § 3599 as authorizing an appointed attorney "to continue to represent [the petitioner] throughout all available federal habeas proceedings and in state clemency proceedings." *Gary v. Humphrey*, No. 97-181, 2011 WL 205772, at *6 (M.D. Ga. Jan. 21, 2011) (emphases omitted). Because it concluded that the extraordinary motion for new trial (the "state motion") at issue here was not the equivalent of clemency, the district court "rejecte[ed] any suggestion that federally funded counsel should be provided to pursue the extraordinary motion for new trial." *Id.* at *7. It determined on the merits that a federal statute, 18 U.S.C. § 3599, does not extend to an attorney's representation in a state proceeding that is not clemency. The district court did *not* issue an administrative-type order disapproving of a monetary amount requested for an attorney's particular undertaking within the scope of his representation. The cases relied on by the majority involve precisely that latter situation that we are *not* faced with today, and I cannot join in its portrayal of that precedent as controlling the resolution of this appeal. The January 21 order was final as a conclusive limitation on the scope of a federal

45

statute, regardless of whether Gary's counsel used the "magic words" in requesting the disputed funds.

Pursuant to 28 U.S.C. § 1291, we have jurisdiction to consider "all final decisions of the district courts." Where the litigation underlying a challenged order has been conclusively resolved, "[w]e treat the postjudgment proceeding as a free-standing litigation." *Thomas v. Blue Cross & Blue Shield Ass'n*, 594 F.3d 823, 829 (11th Cir. 2010) (quotation omitted). "A postjudgment order is final for purposes of section 1291 only if the order disposes of all issues raised in the motion." *Id.* In construing § 1291, "the requirement of finality is to be given a 'practical rather than a technical construction.'" *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 171, 94 S. Ct. 2140, 2149 (1974) (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546, 69 S. Ct. 1221, 1226 (1949)).

Gary appeals from the order denying reconsideration of the denial of funds for his representation in the state motion for new trial. This was the only issue presented in the motion for reconsideration. In that order, the district court finally, conclusively, and expressly ruled that no payment would be authorized for appointed counsel's work on the state motion—period.[4] The district court based

[4] It cannot matter for our jurisdictional analysis that appointed counsel originally presented the district court with *one* CJA voucher requesting payment for work completed on *two* distinct proceedings (state clemency and the state motion for new trial). To hold that this would

its decision on the conclusion that § 3599, in light of *Harbison*, did not extend to appointed counsel's "pursu[it of] an extraordinary motion for new trial." *Gary*, 2011 WL 205772, at *7. This determination "finally settle[d] the matter in litigation," *Delaney's Inc. v. Ill. Union Ins. Co.*, 894 F.2d 1300, 1305 (11th Cir. 1990), which concerned the scope of federally funded representation authorized by § 3599. There was nothing ambiguous or tentative about the district court's determination that would indicate that its ruling would be subject to a third, independent consideration at some future date. *Cf. Thomas*, 594 F.3d at 830 (holding that an order was not final where the district court did not conclusively rule either way on the postjudgment issue). I therefore conclude that the order denying reconsideration was final in the context of the postjudgment proceedings.

But I do not even have to independently arrive at this conclusion, as controlling precedent also confounds the majority's jurisdiction-based dismissal. In *Harbison*, the Supreme Court resolved a question about the scope of

---

be appealable if the requests were made on two different sheets of paper, or to impose a "magic words" requirement on the label of the filing, is impractical and requires the sort of hypertechnical construction that the Supreme Court has specifically instructed us not to employ. *See Eisen*, 417 U.S. at 171, 94 S. Ct. at 2149. The district court made abundantly clear that the January 21 order denying reconsideration was a final resolution of the issue of counsel's representation for work on the state motion. In fact, the district court here had *two* opportunities to clarify the scope of its denial, and it explained in both orders that the scope of § 3599 did not extend to these proceedings. *See Gary v. Terry*, No. 97-181 (S.D. Ga. Dec. 10, 2010) (order denying payment for compensation); *Gary*, 2011 WL 205772 (order denying reconsideration).

47

representation under § 3599 as related to state clemency.  The district court in that case issued an order practically indistinguishable from the one the district court issued here, finding conclusively that the scope of § 3599 did not contemplate federally funded counsel's representation of a petitioner in state clemency proceedings.  *Compare Harbison v. Bell*, No. 97-52, 2007 WL 128954, at *6–7 (E.D. Tenn. 2007) (framing the issue as "whether [§ 3599] provides for federally-appointed counsel during state clemency proceedings"), *with Gary*, 2011 WL 205772, at *1 ("The issue presented . . . is whether Petitioner is entitled to *federally* funded counsel to pursue his extraordinary motion for new trial.").  The Sixth Circuit recognized the appeal as challenging "a final order denying counsel in a clemency proceeding" and concluded that controlling precedent foreclosed the appeal on the merits.[5]  *Harbison v. Bell*, 503 F.3d 566, 570 (6th Cir. 2007).  In reviewing that decision, the Supreme Court made short shrift of any jurisdictional challenge, noting that "the District Court's denial of Harbison's motion to authorize his federal counsel to represent him in state clemency proceedings was

---

[5] We followed a path similar to the Sixth Circuit and arrived at the same conclusion prior to the Supreme Court's *Harbison* ruling.  *See King v. Moore*, 312 F.3d 1365 (11th Cir. 2002) (per curiam) (Edmondson, Black, and Marcus, JJ.).  In *King*, the panel was faced with a district court's order that construed § 3599's predecessor as not extending federal counsel's representation to state clemency proceedings.  *Id.* at 1366.  The panel affirmed without questioning the propriety of the exercise of jurisdiction over the order interpreting the reach of the federal statute.

clearly an appealable order under 28 U.S.C. § 1291." *Harbison v. Bell*, 556 U.S. at 183, 129 S. Ct. at 1485. There is substantively no difference in the jurisdictional inquiry when considering the district court's failure to extend § 3599 to state clemency proceedings on the one hand and a state motion for new trial on the other.

What is more, we have previously exercised jurisdiction to consider the scope of representation beyond clemency. In *In re Lindsey*, a panel of this court considered a petition for mandamus to require appointment of counsel for state proceedings concerning a death-sentenced inmate. 875 F.2d 1502 (11th Cir. 1989) (Tjoflat, Vance, and Kravitch, JJ.) (reviewing the petition under the predecessor statute of § 3599). The petition in *Lindsey* "contest[ed] only the district court's refusal to appoint a psychiatrist and a lawyer . . . to assist Lindsey in his pursuit of state-court remedies" for his competency-to-be-executed claim. *Id.* at 1505. In denying that petition on the merits, we construed the terms of the predecessor to § 3599 to not encompass "any proceedings convened under the authority of a State." *Id.* at 1506. In doing so, we conclusively resolved a question of construction about the scope of representation under the federal statute, which the district court ruled was limited in scope to certain proceedings. *See id.* at 1506–07. That is exactly what we are asked to do here, and at least one other

circuit has explicitly considered post-*Harbison* whether the scope of § 3599 extends to proceedings occurring after state clemency without questioning the propriety of jurisdiction under § 1291. *See Irick v. Bell*, 636 F.3d 289, 290 (6th Cir. 2011) (reviewing "the district court's order denying [petitioner] federally funded counsel with respect to his state competency-to-be-executed proceedings and his efforts to reopen state post-conviction proceedings"), *cert. denied*, 132 S. Ct. 575 (2011).

To justify dismissal, the majority cites to *United States v. Rodriguez* as broadly holding that "a district court's decision denying an appointed attorney's application for compensation under the [CJA] [is] not a final decision reviewable under § 1291." Maj. Op. at 20 (citing 833 F.2d 1536, 1537–38 (11th Cir. 1987) (per curiam)). A brief glance at even just the introductory paragraph of *Rodriguez* makes its inapplicability obvious. In *Rodriguez*, the district court awarded a reduced amount of compensation for work done by an appointed attorney pursuant to his CJA representation—representation on matters within the scope of his CJA duties. 833 F.2d at 1537 & n.1. Dissatisfied with the amount authorized, the appointed attorney appealed the district court's "failure to certify a fee award in the amount requested." *Id.* at 1537. We ruled that the district court's "fee

50

determination" was a type of "administrative action"—not a judicial

decision—and therefore was not a final order under § 1291.[6] *Id.*

An order administratively approving (or disapproving) of funds within the

scope of an attorney's federal representation is not remotely comparable to an

order conclusively determining whether certain proceedings fall within the

representation authorized by § 3599. The order on appeal in *Rodriguez* decided

fees for work completed within the scope of the attorney's authorized CJA

representation. It did not involve an outright denial of funding for an appointed

---

[6] This was also the relevant holding in the cases cited by the majority in footnote 19, none of which involved a district court's determination that the services for which compensation was requested fell outside the scope of representation authorized by the federal statute. *See In re Carlyle*, 644 F.3d 694, 698 (8th Cir. 2011) (finding no jurisdiction "to review a district court's reduction of a CJA voucher"); *United States v. Bloomer*, 150 F.3d 146, 148 (2d Cir. 1998) (per curiam) ("[O]rders concerning *fee determinations* for services already rendered . . . are not appealable . . . ." (emphasis added)); *United States v. Stone*, 53 F.3d 141, 141 (6th Cir. 1995) (holding that the court lacked jurisdiction over the district court's order approving compensation in an amount less than requested); *Shearin v. United States*, 992 F.2d 1195, 1197 (Fed. Cir. 1993) ("Fee determination under the [CJA] is an administrative rather than judicial determination . . . ."); *United States v. Davis*, 953 F.2d 1482, 1497 n.21 (10th Cir. 1992) (noting that the district court's fee determinations are administrative and not appealable but finding the claim at issue was "fundamentally different from claims concerning the *amount* of payment," thereby permitting review of the district court's alleged failure to review CJA vouchers); *Landano v. Rafferty*, 859 F.2d 301, 302 (3d Cir. 1988) (per curiam) ("[A] district court decision determining the amount of [counsel's] compensation is essentially administrative in nature."); *In re Baker*, 693 F.2d 925, 927 (9th Cir. 1982) (per curiam) ("[T]he district judge's certification of attorneys' fees is an administrative act . . . ."); *United States v. Smith*, 633 F.2d 739, 740 (7th Cir. 1980) ("[A]lthough some compensation must be awarded appointed counsel under the [CJA], the district judge is accorded exclusive discretion in fixing the amount." (citations and quotation marks omitted)).

attorney's particular undertaking, and it certainly did not construe the scope of a federal statute governing appointed counsel's representation. Here, the district court expressly ruled that the requested fees were outside the scope of counsel's § 3599 representation. It determined that no funds would extend to work completed on the state motion and thereby limited the scope of a federal statute. The majority portrays *Rodriguez* as definitively illustrating a principle that it arrives at only by selectively reading and expansively interpreting that case. I find it completely unrelated to the resolution of any issue presented in this appeal, as judicial construction of the scope of a federal statute can hardly be considered a mere "administrative" task.

The Fifth Circuit confronted a case in the same context as ours and explicitly recognized its jurisdiction to resolve the issue. *See Clark v. Johnson*, 278 F.3d 459 (5th Cir. 2002). In *Clark*, the district court had previously appointed counsel for federal habeas representation under § 3599's predecessor, § 848(q)(8). *Id.* at 460. After Clark was executed, his attorney filed for reimbursement for "expenses incurred in connection with a state clemency proceeding brought on Clark's behalf." *Id.* In finding that the appellate court had jurisdiction, the Fifth Circuit explained:

The [district court's] order fully and finally disposes of [counsel's] request for reimbursement, an issue that is separate from the merits of the federal habeas corpus proceeding. The district court necessarily interpreted the meaning of "proceedings for executive or other clemency" under § 848(q)(8) to exclude state clemency proceedings. Such a decision is qualitatively different from approving or disapproving the amount of expenses reasonably and necessarily incurred by counsel as it definitively determines whether such services are compensable under the Act as a matter of law.

*Id.* at 461. *Clark* is indistinguishable from the issue at hand and demonstrates that we have jurisdiction to directly address Gary's claim on the merits.[7]

As a final thought, it seems that the majority's conclusion that we may exercise jurisdiction over the district court's denial of expert fees under § 3599(f) applies with equal force to permit review of the denial of representation under § 3599(e). The majority concludes that the district court had jurisdiction "to determine the scope of duties encompassed under the § 3599(a)(2) appointment," including "whether the DNA motion fell within that ambit of representation." Maj. Op. at 26 n.26. It then concludes that we have jurisdiction under § 1291 to review that determination, but only in the context of its order denying expert fees. *Id.* The scope of counsel's federal appointment is *exactly* what the district court

_____

[7] *Clark* found jurisdiction proper as a final order under § 1291 and under the collateral order exception to § 1291's finality requirement. 278 F.3d at 460–61 ("We conclude therefore that under either theory this court has appellate jurisdiction as to the district court's order."). I agree that we could alternatively exercise jurisdiction here under the collateral order exception, though I will not belabor that point because it is obvious to me that the district court issued a final order under § 1291.

decided in its January 21 order denying reconsideration. Strangely, the majority utilizes the denial of expert fees as a means to review the scope of counsel's representation under § 3599(e), which produces the same result as if it had followed precedent and deemed the January 21 order final in the first place. It strikes me as more straightforward to treat the order actually limiting counsel's representation as presenting the question of the reach of § 3599(e). Instead, the majority opts to foreclose on jurisdictional grounds future appeals concerning the scope of representation under § 3599 when the submission to the district court is styled as a request for compensation, even though the district court must necessarily make a definitive determination on the reach of the statute.

In sum, this is not a situation where the district court found that the petitioner was entitled to a lesser fee than claimed and reduced it accordingly; it is a case where, outright, the district court conclusively ruled that no fee was available under the statute for this work. I therefore find that we have jurisdiction to consider the denial of compensation for representation on the state motion.

### III

I further disagree with the majority's perceived limitation on the scope of § 3599, which is based neither in the text of the statute nor the rationale of *Harbison*. I recognize that, without consideration of the statute or case law, it

54

appears strange at first glance for federally appointed counsel to receive federal

funds for representation in a purely state proceeding.  But that is what the Court

approved in *Harbison* based on the language of § 3599—language that the

majority recognizes is "indeed broad" but then quickly narrows.  And I conclude

that the language of § 3599 and the Court's *Harbison* decision require that

appointed counsel represent Gary in the proceedings at issue.

## A

Federal law entitles a federal habeas petitioner to appointment of counsel

when he is financially unable to obtain adequate representation.  18 U.S.C.

§ 3599(a)(2).  An appointed attorney's duties are governed by subsection (e):

> [E]ach attorney . . . shall represent the [petitioner] throughout *every*
> subsequent stage of available judicial proceedings, including . . . *all*
> *available* post-conviction process, together with applications for stays
> of execution and *other appropriate motions and procedures*, and
> shall also represent the [petitioner] in such competency proceedings
> and proceedings for executive or other clemency as may be available
> to the [petitioner].

18 U.S.C. § 3599(e) (emphases added).  *Harbison* clarified that under the plain

language of the statute, federally appointed counsel's duties extend to state

clemency proceedings.  556 U.S. at 185–86, 129 S. Ct. at 1486.  Specifically,

"[b]ecause state clemency proceedings are 'available' to state petitioners who

obtain representation pursuant to subsection (a)(2), the statutory language

55

indicates that appointed counsel's authorized representation includes such proceedings." *Id.* Georgia law permits each convicted individual to file one extraordinary motion for a new trial after thirty days have elapsed from entry of judgment in his criminal proceeding. O.C.G.A § 5-5-41(a), (b). Just as state clemency proceedings are "available" to state petitioners with § 3599 counsel, so too is a state motion for new trial an "available judicial proceeding[]" and, thus, encompassed by the plain language of the statute permitting representation in "other appropriate motions and procedures." 18 U.S.C. § 3599(e); *see Harbison*, 556 U.S. at 188, 129 S. Ct. at 1487 (explaining that the word "available" "indicates the breadth of the representation contemplated" by the statute); *see also Felker v. Turpin*, 83 F.3d 1303, 1312 & n.6 (11th Cir. 1996) (describing an extraordinary motion for new trial as a "state avenue open to process the claim" made by petitioner (alteration and quotation marks omitted)).

The reach of § 3599 is not unbounded.[8] *Harbison* informs us that the statutory term "subsequent" is the operative word to narrow the scope of § 3599(e) rather than any "strict division between federal and state proceedings." 556 U.S.

---

[8] Nor does § 3599 provide a prisoner with a government-issued blank check, as the statute sets the maximum compensation for the attorney's hourly representation and for the expert services requested. 18 U.S.C. § 3599(g). Any requested increase in payment is subject to court approval. *Id.*

at 188, 129 S. Ct. at 1488; *see also id.* at 199, 129 S. Ct. at 1494 (Thomas, J.,

concurring in the judgment) (highlighting the "statute's silence with respect to a

'federal' limitation"). This conclusion follows from the organization of § 3599(e),

which "mirror[s] the *ordinary* course of proceedings for capital defendants." *Id.*

(majority opinion) (emphasis added). Therefore, the Court focused on the

"sequential organization of the statute" to differentiate between a "subsequent

stage" of judicial proceedings on the one hand and "the commencement of new

judicial proceedings" on the other. *Id.* at 188–89, 129 S. Ct. at 1488.

Representation under § 3599 is proper in the former, but not the latter, type of

proceeding. *See id.* In this case, the extraordinary motion for new trial falls

within the ambit of the "ordinary course of proceedings" for a death-sentenced

petitioner.

One need only look to relevant case law in order to figure out that death-

sentenced petitioners typically file these sorts of extraordinary motions for a new

trial after conclusion of their federal habeas proceedings. *See, e.g.*, *In re Davis*,

565 F.3d 810, 814 (11th Cir. 2009) (per curiam) (petitioner filed the state motion

after federal habeas proceedings); *Felker*, 83 F.3d at 1312 & n.6; *Blankenship v.*

*Terry*, No. 05-194, 2007 WL 4404972, at *42 (S.D. Ga. Dec. 13, 2007) (quoting

state's argument in federal habeas briefing that "[p]etitioner has an *available*

remedy in state court to seek post-conviction DNA testing" (emphasis added));

*Jefferson v. Terry*, 490 F. Supp. 2d 1261, 1345 n.24 (N.D. Ga. 2007) (advising

petitioner during federal habeas that he "can pursue a claim of actual innocence in

state court by filing an extraordinary motion for new trial"), *rev'd in part*, 570

F.3d 1283 (11th Cir. 2009); *Crawford v. State*, 597 S.E.2d 403, 403 (Ga. 2004)

(petitioner filed extraordinary motion after conclusion of federal habeas review).

And this is a logical order, given the high standard for granting extraordinary

motions for new trial, *see Wright v. State*, 712 S.E.2d 105, 107 (Ga. Ct. App.

2011) (noting the six facts a movant must establish for the motion to be granted),

and the discretionary procedure for review of their denial, *see Crawford*, 597

S.E.2d at 404.  This motion, much like a clemency hearing, presents the state with

a final chance to rectify any fundamental miscarriage of justice.  The most

appropriate time for an individual to file one of these motions would undoubtedly

be *after* all the evidence has been investigated, the facts developed, and the

arguments made in the traditional channels of review (i.e. state postconviction and

federal habeas proceedings).  Undoubtedly many cases are like this one, where the

basis for the extraordinary motion was not fully developed *until* federal habeas

counsel had been appointed.  *Cf. Harbison*, 556 U.S. at 193, 129 S. Ct. at 1490–91

("Congress likely appreciated that federal habeas counsel are well positioned to

represent their clients in the state clemency proceedings that typically follow the conclusion of § 2254 litigation. . . . [T]he work of competent counsel during habeas corpus representation may provide the basis for a persuasive clemency application."). As a result, I have a hard time believing that habeas petitioners are jumping at the chance to file their one extraordinary motion for new trial before developing the facts and argument that would serve as its basis. If each death-sentenced individual is entitled to one of these motions, why would he rush to present it to the state courts before developing all the facts and arguments to support it?

Our analysis is also informed by looking to what would not be a subsequent stage of proceedings. In *Harbison*, the Supreme Court provides the quintessential example: state postconviction litigation.[9] *See id.* at 189–90, 129 S. Ct. at 1488–89. This is because under Congress's scheme governing federal habeas review, presentation of a claim to state courts is a prerequisite to federal review of that

---

[9] Concurring in the judgment, Chief Justice Roberts provided other examples of proceedings that would not be subsequent stages, including "a challenge to prison conditions or a suit for divorce in state court." *Harbison*, 556 U.S. at 195–96, 129 S. Ct. at 1492. I understand this statement to mean that litigation unrelated to counsel's § 2254 representation constitutes a "new proceeding[]" not entitled to funding under § 3599, and I do not believe it speaks to the situation at hand where the state motion contemplates issues intertwined with counsel's § 2254 representation. *See also Martel v. Clair*, 565 U.S. ___, 132 S. Ct. 1276, 1283 (2012) (explaining that § 3599 extends a right to counsel "for all post-conviction proceedings and related activities").

claim.[10]  *Id.* at 189, 129 S. Ct. at 1488; *see* 28 U.S.C. § 2254(b)(1).  No provision of federal or state law requires a state extraordinary motion for new trial to precede federal habeas review, the point at which counsel's appointment attaches under § 3599.  Quite the opposite, one state motion can be filed *at any time* after the expiration of the thirty-day statutory period.  *See* O.C.G.A. § 5-5-41(a), (b).

Instead of considering the "ordinary course" of proceedings for a death-sentenced inmate, the majority has crafted a novel standard whereby § 3599(e) is informed by the specific course of proceedings contemplated by the state in which the petitioner is imprisoned.  In examining the representation at issue here, the majority relies almost exclusively on the idea that clemency comes after federal habeas proceedings have concluded, while the state motion for new trial can be filed at any time.  Maj. Op. at 31–35.  But it is not so invariably true that clemency proceedings occur after the conclusion of federal habeas.  In Utah, for example, a death-sentenced inmate can petition for clemency at any time after conclusion of the direct appeal.  Utah Admin. Code r. 671-312-3(1); *see also* Conn. Gen. Stat. § 54-130a(a), (b); State of Delaware, Rules of the Board of Pardons,

---

[10] The Court approved of representation in some state-specific litigation germane to counsel's federal habeas representation.  *Harbison*, 556 U.S. at 189–90 & n.7, 129 S. Ct. at 1488–89 (noting that a case-by-case determination is appropriate where counsel seeks to return to state court to litigate unexhausted claims in the federal petition); *id.* at 187 n.6, 129 S. Ct. at 1487 (explaining that it would be absurd to prohibit counsel from representing a state inmate in application for a state court stay of execution before seeking such relief in federal court).

http://pardons.delaware.gov/information/rules.shtml#Rule7 (last visited June 15, 2012) (excluding death-sentenced petitioners from the typical rule that applications for commutation must follow the conclusion of collateral review); Louisiana Department of Public Safety and Corrections, Rules, http://www.doc.louisiana.gov/view.php?cat=13&id=83 (last visited June 15, 2012) (requiring under Rule 1D that a petition for clemency be made within one year of denial of direct appeal); Washington State Clemency & Pardons Board Policies, http://www.governor.wa.gov/clemency/documents/policies.pdf (last visited June 15, 2012) (stating that a petition for pardon or commutation generally "will not be heard until all direct appeals have been exhausted"). Thus, in a number of states, a prisoner may petition for clemency within the same relevant time frame as an inmate in Georgia can file the extraordinary motion for new trial. The Supreme Court did not consider these nuances in timing of a clemency petition to determine whether it "ordinarily" follows representation in federal habeas proceedings, and neither should we.

Additional considerations bear on the propriety of finding that § 3599 encompasses this request. The representation here involves work on an extraordinary motion for new trial—the only one that Gary can present under state law. If granted, the federal appointment must end because retrial is a new

61

proceeding, and the state would be required to appoint counsel to Gary for retrial. *Harbison*, 556 U.S. at 189, 129 S. Ct. at 1488. Furthermore, the basis for this motion was developed pursuant to counsel's representation in federal habeas proceedings, which means that counsel is already intimately familiar with the details and arguments. *See id.* at 193, 129 S. Ct. at 1491 ("[T]he work of competent counsel during habeas corpus representation may provide the basis for a persuasive clemency application. Harbison's federally appointed counsel developed extensive information . . . that was not presented during his trial or appeals."). Lastly, the majority's reasoning related to federalism—namely discomfort with federal supervision over purely state proceedings—applies with equal force to representation in clemency proceedings, and the Supreme Court has already considered and flatly rejected those concerns in *Harbison*. *See id.* at 192 n.9, 129 S. Ct. at 1490.

Unlike state postconviction proceedings instituted after the conclusion of federal habeas review, the extraordinary motion for new trial does not constitute a new proceeding any more than state clemency would. It is merely one of the "multiple assurances that are applied before a death sentence is carried out." *Kansas v. Marsh*, 548 U.S. 163, 193, 126 S. Ct. 2516, 2536 (2006) (Scalia, J., concurring). The limitation that the majority crafts is not found in the text of

62

§ 3599 or the direction of *Harbison*. Instead, it is a judgment that Congress must not have meant what it said when using broad phrases like "every subsequent stage," "all available post-conviction process," and "other appropriate motions and procedures." 18 U.S.C. § 3599(e). It is not up to us to determine whether the result of application of the statute "upholds a very bad policy." *Harbison*, 556 U.S. at 198, 129 S. Ct. at 1494 (Thomas, J., concurring in the judgment) (quotation omitted). Section 3599 means what it says and covers counsel's representation here.

B

The district court order denying funding for expert services, Appeal No. 11-15396, was premised on the conclusion that § 3599 does not cover counsel's representation on the state motion. Because I find that it does, I would vacate its order and remand for consideration of whether those services were reasonably necessary to counsel's representation under the statute and whether funding should be provided.

IV

The majority's resolution of the issues presented here works to undermine the text of § 3599 and Supreme Court precedent. It also disturbs well-settled law governing our ability to review final orders. With its opinion, the majority offers

up justification to foreclose a grant of expert assistance to practically all death-sentenced clemency petitioners, even though Congress has specifically provided for those services by statute in recognition of "the seriousness of the possible penalty and . . . the unique and complex nature of the litigation." 18 U.S.C. § 3599(d). It ignores the unquestionably broad language describing the scope of representation under § 3599 in favor of a state-specific approach inconsistent with *Harbison*. And it ensures that any rejection of funding for counsel to represent a death-sentenced individual in any proceeding apart from state clemency is unreviewable—unless, of course, it is appealed under the guise of a denial of expert funding. I disagree, and I would reverse the district court's order limiting the scope of representation under § 3599(e), vacate the orders regarding expert services, and remand to the district court.